**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| STEINER TECHNOLOGIES, LLC,<br>a Missouri Limited Liability Company,<br><br>And<br><br>ROBERT E. STEINER, an individual,<br><br>        Plaintiffs,<br><br>v.<br><br>ESSICK AIR PRODUCTS, INC.<br>an Arkansas Corporation,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COME NOW Plaintiffs, Robert E. Steiner ("Steiner") and Steiner Technologies, LLC (the "Steiner Tech"), collectively by and through their undersigned attorneys, and for their Complaint against Defendant Essick Air Products, Inc. ("Essick"), herein state as follows:

## THE PARTIES AND RELATED ENTITIES AND PERSONS

### *Plaintiff Robert E. Steiner*

1.      Robert E. Steiner ("Steiner") is an individual who resides at 1760 Horseshoe Ridge, Chesterfield, Missouri 63005.

*Plaintiff Steiner Technologies, LLC*

2.      Steiner Technologies, LLC ("Steiner Tech") is a limited liability company formed under the laws of the State of Missouri and registered in the State of Missouri, having a principal place of business at 1760 Horseshoe Ridge, Chesterfield, Missouri 63005, and is wholly owned by Robert E. Steiner. Steiner provides professional services through Steiner Tech to third parties.

*Defendant Essick*

3.      Upon information and belief, Essick Air Products, Inc. ("Essick") is an Arkansas corporation having its principal place of business at 5800 Murray Street, Little Rock, AR 72209.

4.      Upon information and belief, Essick is a manufacturer of humidifiers and an importer of pre-built humidifiers and component parts ("Essick Components") for humidifiers ("Essick Products") that are assembled in the United States by Essick.  Exhibit 1.

5.      Upon information and belief, Essick offers for sale and sells Essick Products throughout the United States, including the Eastern District of Missouri, through numerous distribution channels including, Essick's direct on-line store at www.essickair.com, as well as on-line stores such as Amazon.com and through retailers including, but not limited to, Home Depot, 's, Sears, Menards, and Ace Hardware. Essick sells these Essick Products under various brand names, including, but not limited to, Essick's ESSICK AIR, AIRCARE, Lowe's IDYLIS, and Sear's KENMORE.

6.      Upon information and belief, Essick purchases and takes possession of pre-assembled Essick Products and Essick Components to be used in the manufacture of Essick Products in the United States at foreign ports such as in Hong Kong and China.

2

**Third Party Futec**

7.      Upon information and belief, Futec, Products Ltd. ("Futec") is a Chinese entity located at 23/F, Westley Square, 48 Hoi Yuen Road, Kwun Tong KZLN, Kowloon Hong Kong.

8.      Futec is a manufacturer and exporter of electrical and electronic components and electrical and electronic products including motors, controllers and assembled humidifiers, collectively hereinafter referred to as "Futec Products."

9.      Upon information and belief, Futec manufactures and sells Futec Products to Essick to be sold by Essick as Essick Products or as Essick Components to be used by Essick in the manufacture of Essick Products.

**Third Party Euroka**

10.      Upon information and belief, Euroka Electrical Manufacturing Co., Ltd. ("Euroka") is a Chinese entity located at Room 1503, 15th/Floor, Island Beverley, No. 1 Great George Street, Causeway Bay, Hong Kong and having a Factory at Huangwu Industrial Zone, Dongxing Road, Dongkeng Town, Dongguan city, China.

11.      Euroka is a manufacturer and exporter of electric motors, hereinafter referred to as "Euroka Products."

12.      Upon information and belief, Euroka manufactures and sells Euroka Products to Essick to be sold by Essick as Essick Products or as Essick Components to be used by Essick in the manufacture of Essick Products.

**Third Party Shenzhen Noke Technology Co. Ltd.**

13.      Upon information and belief, Shenzhen Noke Technology Co. Ltd ("Noke"), is a Chinese entity located 4th Floor, building 19, YangMen Industry Zone, Xili Town, Nanshan District, Shenzhen City, China 518102.

3

14.     Noke is a manufacturer and exporter of electrical and electronic components and electrical and electronic products including controllers such as controllers for motors, hereinafter referred to as "Noke Products."

15.     Upon information and belief, Noke manufactures and sells Noke Products to Essick to be sold by Essick as Essick Products or as Essick Components to be used by Essick in the manufacture of Essick Products.

### Third Party ProMotor

16.     Upon information and belief, Professional Motor (Ltd.) Led ("ProMotor"), is a Chinese entity located at A55 Flushing Ngau Industrial Estate, Hu Long Gang, Shenzhen, China.

17.     ProMotor is a manufacturer and exporter of electrical and electronic components and electrical and electronic products including motors, controls, and assembled humidifiers, hereinafter referred to as "ProMotor Products."

18.     Upon information and belief, ProMotor manufactures and sells ProMotor Products to Essick to be sold by Essick as Essick Products or as Essick Components to be used by Essick in the manufacture of Essick Products.

### Third Party ABJ

19.     Upon information and belief, A Better Electrical Manufacturing Company, Ltd., dba ABJ Electric Motor Company (referred herein as "ABJ") and also dba Innotec Holding Company Limited, is a Chinese entity located at No. 5th Tong Fu Yu Road, FuKeng Zone, GuangLan Street, BaoAn District, ShenZhen City, China.

20.     ABJ is a manufacturer and exporter of electric motors, hereinafter referred to as "ABJ Products."

4

21.     Upon information and belief, ABJ manufactures and sells ABJ Products to Essick to be sold by Essick as Essick Products or as Essick Components to be used by Essick in the manufacture of Essick Products.

**Third Party Man-Li**

22.     Upon information and belief, Man-Li Paper Products Mft. ("Man-Li") is a Chinese entity located at Hui Shen Road, Louxia Industrial, Zhenlong Town Huiyang Area, Huizhou, China.

23.     Man-Li is a manufacturer and exporter of paper products including packaging, containers and instruction owner's manuals, hereinafter referred to as "Man-Li Products."

24.     Upon information and belief, Man-Li manufactures and sells Man-Li Products to Essick to be sold by Essick as packaging for Essick Products as sold within the United States.

**Third party Wellsum.**

25.     Upon information and belief, Wellsum Electrical, Co. Ltd ("Wellsum") is a Chinese entity located at Tangxiayong industrial, Songgang Town, BaoAn zone, Shenzhen city, GD, China.

**26.**     Wellsum is a manufacturer and exporter of various components including electric motors and plastic tooling for injection molding of plastic parts, hereinafter referred to as "Wellsum Products."

27.     Upon information and belief, Wellsum manufactures and sells Wellsum Products to Essick to be sold by Essick as Essick Products or as Essick Components or to be used by Essick in the manufacture of Essick Products.

### Third Party Yang Feng

28.    Upon information and belief, Yang Feng Electric Factory ("Yang Feng") is a Chinese manufacturer located in China.

29.    Yang Feng is a manufacturer and exporter of electrical components including electric motors referred herein as "Yang Feng Products."

30.    Upon information and belief, Yang Feng manufactured and sold Yan Feng Products to Essick that were sold by Essick as Essick Products or as Essick Components that were used by Essick in the manufacture of Essick Products.

### Third Party Shenzhen Tech

31.    Upon information and belief, Shenzhen Wu Sin Yuan Technology-Co., Ltd,, ("Shenzhen Tech") is a Chinese manufacturer located in Dongguan, Shenzhen, China.

32.    Shenzhen Tech is a manufacturer and exporter of plastic parts and components. referred herein as "Shenzhen Tech Products."

33.    Upon information and belief, Shenzhen Tech manufactures and sells Shenzhen Tech Products to Noke and/or Essick to be sold by Essick as Essick Products or as Essick Components or to be used by Essick in the manufacture of Essick Products.

### Third Party JinBida

34.    Upon information and belief, JinBida Electrical Co. Ltd. ("JinBida") is a Chinese entity located in Shenzhen, China, PRC.

35.    JinBida is a manufacturer and exporter of electrical components including electrical motors referred herein as "JinBida Products".

36.     Upon information and belief, JinBida manufactures and sells JinBida Products to Essick to be sold by Essick as Essick Products or as Essick Components or to be used by Essick in the manufacture of Essick Products.

## JURISDICTION AND VENUE

37.     Count I is an action for patent infringement arising under the Patent Laws of the United Statement, Title 35, United Stated Code, including, but not limited to, 35 U.S.C. §§ 271 and 281.

38.     Count II is an action for false marking under the Patent Laws of the United Statement, Title 35, United Stated Code, including, but not limited to, 35 U.S.C. §§ 292.

39.     Jurisdiction is proper in this Court for Counts I and II pursuant to 28 U.S.C. §1331 and §1338(a) as Plaintiff alleges substantial claims arising under the Patent Act of 1952 an in particular federal statutes 35 U.S.C. §§ 271, 281 and 292.

40.     Count III contains allegations that fall under the Lanham Act, 15 U.S.C. §1051, et seq.

41.     Jurisdiction is proper in this Court for Counts I-III pursuant to 28 U.S.C. §1331, §1332(a) and §11441(a).

42.     Counts IV through VII are actions that fall under State common law.

43.     This Court has original subject matter jurisdiction over all Counts pursuant to diversity of citizenship under 28 U.S.C. §1332(a). The amount in controversy for each Count exceeds $75,000.

44.     Personal jurisdiction and venue are proper in this Judicial District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District. In particular, this Court has personal jurisdiction over Essick as

Essick has committed and continues to commit acts giving rise to this action within the Eastern District of Missouri.

45.     Venue is proper in the Eastern District of Missouri Eastern Division under 28 U.S.C. §§ 1391(b) and (c) and pursuant to local rules in that a substantial part of the events giving rise to the claims occurred in this judicial district and Essick is subject to personal jurisdiction in this judicial district.

## GENERAL ALLEGATIONS

46.     Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-45 above, inclusive, as if set forth fully herein.

### *Relationships Among the Parties and Involved Third Parties*

47.     For the past 54 years, Steiner has provided engineering and professional technical services to various entities in the United States, such as Emerson Electric Co. ("Emerson") and Essick. Steiner received a Bachelor of Science in Electrical Engineering from Washington University in St. Louis and a Master of Business Administration (MBA) from St. Louis University. He served as a Captain in the United States Army. Following his discharge from the army, Steiner was employed as a research and development engineer, chief engineer, and as Vice President of Engineering at Emerson Electric Company ("Emerson") for 32 years. Steiner was a named inventor on more than sixteen (16) issued U.S. patents while employed by Emerson. Steiner left the employment of Emerson in 1993. For his creative work at Emerson, in 1994 Steiner was recognized by the Bar Association of Metropolitan St. Louis as the "Missouri Inventor of the Year."

48.     Upon leaving Emerson, in 1994 Steiner formed Steiner Technologies ("Steiner Tech"), which was formally organized in its current form under Missouri law as a Limited Liability Company, Steiner Technologies LLC on October 8, 1999. Since 1994 Steiner Tech has provided professional consulting, technical, engineering, component and product sourcing, manufacturing and operational services ("Steiner Services") to customers including Emerson. Steiner Services have included, but have not been limited to, supplier/manufacturer sourcing and management of manufactured products for U.S. businesses by Chinese manufacturers, suppliers, product development, and problem resolution.

49.     Since forming Steiner Tech, Steiner has applied for and been named the sole inventor on eight (8) issued U.S. patents and several associated foreign patents ("Steiner Patents"), all which are related to motors, controls, and motor driven products such as humidifiers and fans. Steiner is the 100 percent owner of each of the Steiner Patents.

50.     In particular, Steiner is the sole inventor and owner and has all rights, interests, and legal title in the following Patents:

a. U.S. Patent No. 5,619,086 (" '086 Patent") entitled "Twin Bobbin C-Frame Motors and Methods for Making Same," (Exhibit 2), as well as its Chinese counterpart Chinese Patent 83105 (also referred to as the "96191683-4" or "Chinese '086 Patent") that issued on December 14, 2001, and counterparts in Mexico, Vietnam and Canada; and

b. U.S. Patent No. 8,373,378 (" '378 Patent") entitled "Systems and Method of Motor Speed Control" that issued on February 12, 2013.  Exhibit 3.

51.     Steiner granted Steiner Tech a license to commercialize the Steiner Patents including the right to sublicense one or more of the Steiner Patents to Licensed Steiner Tech Suppliers in conjunction with supply and manufacturing contracts with manufacturers of

products resulting from or in association with Steiner Services as provided to customers of Steiner Tech.

52.     Beginning in March 1999 through the present, Steiner has provided and continues to provide Steiner Services to Emerson through Steiner Tech that included technical services, new product development, problem resolution, sourcing of components including electrical, electronic, and mechanical parts, manufacturing tooling, and supplier/manufacturer relations management in support of Emerson's humidifier and ceiling fan product line. This included Steiner supplying and managing certain supplier arrangements with each Steiner developed manufacturer ("Steiner Tech Supplier") on behalf of Emerson.

53.     From at least around March 1999 through the present, Steiner Tech and Emerson agreed that Steiner Tech would provide Steiner Services from time to time as requested by Emerson and entered into a contract for the same ("Steiner Tech-Emerson Contract"). At all times, the Steiner Tech-Emerson Contract has provided for deferred compensation for Steiner Services rendered to Emerson and deferred and indirect reimbursement of expenses and costs incurred by Steiner Tech related to the Steiner Services. This deferred and indirection compensation was agreed by Emerson and Steiner Tech to be in lieu of direct compensation as provided during the earlier Steiner Services. Emerson and Steiner Tech agreed that Emerson would pay an incremental cost ("Steiner Services Premium") to the Steiner Tech Suppliers for each component and product Emerson purchased from the Steiner Tech Suppliers, and that Steiner Tech would arrange with the Steiner Tech Suppliers to receive the Steiner Services Premium as a "commission" from the Steiner Tech Suppliers.

54.     Pursuant to the Steiner Tech-Emerson Contract, Emerson agreed and expected that Steiner Tech would enter into separate supporting agreements with each of the Steiner Tech

10

Suppliers to complete the Steiner Tech-Emerson Contract to provide for the payment of the Steiner Service Premium as a commission on sales to Emerson. Each of these separate agreements with Steiner Tech Suppliers would provide the means for Emerson's deferred and indirect compensation and reimbursement as paid by Emerson to be indirectly paid to Steiner Tech on a deferred per-product purchased basis.

55.     Emerson and Steiner Tech also agreed that, in lieu of Emerson receiving a license to the Steiner Patents and Emerson making direct payment of patent royalties to Steiner or Steiner Tech for Emerson's practicing the Steiner Patents such as the '086 Patent, Emerson would pay a patent royalty premium on purchases made by Emerson from Steiner Tech Suppliers. Emerson would purchase the patented products solely from a Steiner Tech Supplier that had a patent license from Steiner Tech. As such, Emerson would be paying the Steiner Patent Premium as a part of the per-unit cost Emerson paid to a Steiner Tech Supplier having a patent license from Steiner Tech ("Licensed Steiner Tech Supplier") and that such payment of the Steiner Patent Premium was separate from the Steiner Services Premium. Emerson and Steiner Tech agreed that, with the payment of the Steiner Patent Premium by Emerson to the Licensed Steiner Tech Supplier, the Licensed Steiner Tech Supplier would make the Steiner Patent Premium payment to Steiner Tech as an indirect patent royalty payment.  Emerson understood that the payment of the Steiner Patent Premium to the Licensed Steiner Tech Supplier increased the per-unit cost paid by Emerson to the Licensed Steiner Tech Supplier.

56.     Under the terms and conditions of the Steiner Tech-Emerson Contract, Emerson agreed and understood that Steiner Tech would enter into separate patent licensing agreements with each of the Licensed Steiner Tech Suppliers in order that Steiner Tech would receive the

patent royalty and that each product that Emerson purchased from the Steiner Tech Supplier was licensed under the Steiner Patents as appropriate.

57.     From March 1999 through the present, Emerson requested that Steiner Tech perform various technical, sourcing, manufacturing, safety and quality control tasks and projects for Emerson under the Steiner Tech-Emerson Contract, and Steiner Tech provided the requested Steiner Services to Emerson, which Emerson accepted, relied on and benefited.

58.     From March 1999 through the present, Emerson paid Steiner Tech Suppliers the Steiner Services Premium for each purchase from the Steiner Tech Suppliers with knowledge and understanding that the Steiner Tech Supplier would in turn provide the Steiner Services Premium to Steiner Tech as a commission that was indirect and deferred compensation for Steiner Services provided by Steiner Tech to Emerson.

59.     From March 1999 through the present, Emerson relied on the Steiner Tech-Emerson Contract and Steiner Tech's obligation thereunder to provide licenses to the Steiner Patents to the Steiner Tech Suppliers, as assurance that the Emerson Components and Emerson Products that Emerson purchased from the Steiner Tech Suppliers were licensed under the Steiner Patents.

60.     From March 1999 through the present, Emerson paid the Licensed Steiner Tech Suppliers the Steiner Patent Premium for each purchase from the Licensed Steiner Tech Suppliers with knowledge and understanding that the Licensed Steiner Tech Suppliers were providing the Steiner Patent Premium to Steiner Tech as a royalty under the Steiner Patents, and for which Emerson received a duly licensed product.

61.     From March 1999 through the present, Emerson paid the per-unit prices to the Steiner Tech Suppliers with full knowledge that a portion of the per-unit prices paid to the

Steiner Tech Suppliers were being paid to Steiner Tech for prior and current Steiner Services and for payment of Steiner Patent Royalties.

62.     From March 1999 through the present, under the terms of the Steiner Tech-Emerson Contract at no time has Emerson provided direct payment or compensation to Steiner or Steiner Tech for Steiner Services provided to Emerson or provided reimbursement to Steiner or Steiner Tech for expenses or costs incurred in support of Steiner Services to Emerson.

### The Steiner Tech-Essick Contract

63.     In 2006, Essick began negotiating with Emerson for the purchase of Emerson's humidifier product line assets. Emerson represented to Essick that Steiner Tech and in particular, Steiner, was an available key asset to support the Emerson humidifier business and that Steiner Tech was most likely available to continue to provide Steiner Services to Essick in support of Essick's acquired Emerson humidifier product line assets.

64.     In 2007, in part based on Steiner Services being available to support the Emerson humidifier assets, Essick acquired the assets of the humidifier product line from Emerson ("Acquired Emerson Products"). While Essick interviewed at least one Emerson engineering employee having knowledge of the Acquired Emerson Products, Essick did not obtain any personnel or services support with the Acquired Emerson Products.

65.     As such, on April 15, 2007 Essick entered into a contract with Steiner Tech (Steiner Tech-Essick Contract) to obtain Steiner Services in support of Essick's Acquired Emerson Products, on the same basis that Steiner Tech provided the Steiner Services previously to Emerson.

66.     The Steiner Tech-Essick Contract provided that Steiner Tech provide Steiner Services to Essick from time to time as requested by Essick. Essick would request or assign

specific tasks, projects or services from Steiner Tech, and Steiner Tech would provide Essick with such Steiner Services.

67.     Pursuant to the Steiner Tech-Essick Contract, Essick requested that Steiner Tech provide Steiner Services as previously provided to Emerson in support of the Acquired Emerson Products. The Essick requested services included Steiner Services covering technical services related to humidifiers including, without limitation, the design, engineering, manufacturing, supplier sourcing, manufacturer management, quality control, product and component sourcing, manufacture and packaging.

68.     On April 15, 2007, Essick began to request and utilize Steiner Services from Steiner Tech under the Steiner Tech-Essick Contract to provide support services for the integration of the Acquired Emerson Products into the Essick business line including Steiner Services in support of Essick's continuing prior supplier and manufacturer relations including those with Steiner Tech Suppliers.

69.     Pursuant to the Steiner Tech-Essick Contract, Essick requested Steiner Tech also provide Steiner Services in support of Essick's other humidifier business that was in addition to the Acquired Emerson Products.

70.     From April 15, 2007 through the end of 2014, Steiner Tech provided Steiner Services to Essick under the Steiner Tech-Essick Contract as requested by Essick in support of various Essick Products.

71.     From April 15, 2007 through the end of 2014, Essick utilized Steiner Services in support of its Essick Products, namely, Essick Humidifiers that Essick manufactured, offered for sale, sold and exported from the U.S. Steiner Services supported and benefitted over twenty (20)

models of Essick Humidifiers as sold by Essick since 2007, the vast majority of which continue to be manufactured by Essick, many of which are Essick's best-selling products.

72.     Steiner Services requested by Essick and provided by Steiner Tech included supplier management of various Steiner Tech Suppliers for providing products and services to Essick. The Steiner Tech Suppliers providing components and products to Essick include, but are not limited to, Noke, ProMotor, ABJ, Man-Li, Wellsum, Yang Feng, Shenzhen Tech, and JinBida.

73.     Pursuant to the Steiner Tech-Essick Contract, Essick and Steiner Tech agreed that, in recognition that the Steiner Services benefitted Essick Products during their useful lives, that, in lieu of Essick making direct and immediate compensation to Steiner Tech for the Steiner Services, Essick would continue to pay the Steiner Service Premium to the Steiner Tech Suppliers on a per product purchase from each Steiner Tech Supplier that would in turn pay Steiner Tech a commission based thereon.  Essick and Steiner agreed that Steiner Tech's only compensation for the Steiner Services would be through this indirect and deferred payment arrangement.

74.     To accomplish this, Pursuant to the Steiner Tech-Essick Contract, as with the Steiner Tech-Emerson Contract, Essick agreed and understood that Steiner Tech would enter into separate supplier contracts as supporting agreements to the Steiner Tech-Essick Contract to effectuate the deferred and indirect compensation arrangement through the commission paid to Steiner Tech by the Steiner Tech Suppliers on each purchase.  Exhibit 4 (Under Seal).

75.     Essick further knew that Steiner owned the Steiner Patents and in particular the '086 Patent. See Exhibits 5-10, and Exhibit 11 (Under Seal). As provided by the Steiner Tech-Essick Contract, Steiner Tech would enter into patent licensing agreements with each of the

15

Licensed Steiner Tech Suppliers to provide that Licensed Steiner Tech Supplier with a license for each product that Essick purchased from the Steiner Tech Supplier and for which a Steiner Patent Premium would be added to the cost paid by Essick.  Essick and Steiner Tech agreed that under each license with the Licensed Steiner Tech Supplier, the Licensed Steiner Tech Supplier would pay the received Steiner Patent Premium to Steiner Tech as an indirect payment of a patent royalty that the Licensed Steiner Tech Supplier would pay to Steiner Tech on each Essick purchase. Essick further understood that each Steiner Tech Supplier would be including the Steiner Patent Premium in the cost paid by Essick for the purchase of each applicable product.

76.     Based on this arrangement under the Steiner Tech-Essick Contract, Essick never sought nor obtained a license to any of the Steiner Patents but relied on the Steiner Tech-Essick Contract and Steiner Tech's licensing to the Steiner Tech Suppliers to ensure that the components and products that Essick purchased would be licensed under the Steiner Patents.

77.     Further, pursuant to the Steiner Tech-Essick Contract, Essick relied on the Steiner Tech-Essick Contract to have Steiner grant a license to Essick's customer Lowe's Home Improvement ("Lowe's") in 2012 when Lowe's, in order to complete the contract for purchase of new Essick humidifiers for Lowe's (Exhibit 11 (Under Seal)), required that Essick seek and obtain for Lowe's a direct license from Steiner under Steiner's '086 Patent for the Essick model IHUM-10-140 humidifier.  See Exhibit 11, Para. 1.0, Section 2.4(iii) (Under Seal) and Exhibits 5-9. At that time, Essick affirmed its knowledge of its payment of the Steiner Patent Premium paid to Steiner Tech Suppliers and the subsequent payment to Steiner Tech when Essick negotiated a patent license agreement to Steiner's '086 Patent between Steiner and Lowe's Home Improvement ("Lowe's").  Exhibits 9 and 10.  That license agreement (the "Steiner-Lowe's '086 Patent License"), as negotiated in large part by Essick, was drafted to expressly state: "*Licensor*

[Steiner] agrees and acknowledges that *it will benefit if Lowe's issues the one or more purchase orders* mentioned in Section 2 *and that issuance of each purchase order provides sufficient consideration for the rights and privileges granted by Licensor* [Steiner] to Licensee [Lowe's], *without Licensee being charged any royalty or license fee relating to its use of the license*." Exhibit 10, Para. 3.  (emphasis added).

78.     In September 2012 during a trip to China by Steiner and Chuck Davis, Essick's Vice President of Manufacturing, Davis and Steiner discussed the Steiner Service Premium and Steiner Patent Premium. In that discussion, Davis discussed the increased cost impact the commission paid by Essick in the form of the Steiner Service Premium and Steiner Patent Premium had on the per-unit cost paid by Essick to the Steiner Tech Suppliers.

79.     For all relevant times from 2007 to mid-2014, Essick requested technical, sourcing, manufacturing, safety and quality control tasks and projects for Essick under the Steiner Tech-Essick Contract and Steiner Tech provided the Steiner Services from Steiner Tech, which Essick accepted, relied on and benefited.

80.     On December 8, 2014, Steiner Tech sent Essick's Davis a correspondence that included an attached "Pending Project List Dec 2014" that identified fifteen (15) pending Steiner Service projects being performed for Essick.  Exhibit 12 (Under Seal).

81.     For all relevant times until the end of 2014, Essick paid Steiner Tech Suppliers the Steiner Services Premium for each Essick Component and Essick Product from the Steiner Tech Suppliers with the knowledge and understanding that the Steiner Tech Supplier was providing the Steiner Services Premium to Steiner Tech as compensation for Steiner Services provided by Steiner Tech to Essick and for costs and expenses incurred by Steiner Tech in support thereof.

17

82.     For all relevant times until the end of 2014, Essick relied on the Steiner Tech-Essick Contract and Steiner Tech's obligations thereunder to provide licenses to the Steiner Patents to the Licensed Steiner Tech Suppliers, as assurance that the components and products purchased by Essick from the Licensed Steiner Tech Suppliers were duly licensed under the Steiner Patents.

83.     For all relevant times until the end of 2014, Essick paid the Licensed Steiner Tech Suppliers the Steiner Patent Premium for each component and product Essick purchased from the Licensed Steiner Tech Suppliers.

84.     From 2007 through the end of 2014, Essick paid the per-unit prices to the Steiner Tech Suppliers with full knowledge that a portion of the per-unit prices paid by Essick to the Steiner Tech Suppliers would be paid as a commission to Steiner Tech as compensation for Steiner Services received by Essick.

85.     From 2007 through the end of 2014, Steiner Tech received the commission from the Steiner Tech Suppliers based on purchases made by Essick that included the Steiner Services Premium and the Steiner Patent Premium.

86.     For all relevant times, Essick and Steiner and Steiner Tech understood and agreed that due to the nature of services provided by Steiner Tech to Essick as to new product development, engineering and design of Essick Components and Essick Products, the sourcing, manufacturing and quality control of such, were confidential in nature, and at all relevant times, Essick and Steiner and Steiner Tech treated all such communications and Steiner Services as being confidential.

87.     Under the terms of the Steiner Tech-Essick Contract that provided for the deferred and indirect payments through purchases made by Essick on Steiner Tech Supplies, at no time

has Essick provided any form of direct compensation to Steiner Tech or Steiner for any Steiner Services that Essick requested and received from Steiner Tech and at no time has Essick provided any reimbursement to Steiner Tech or Steiner for any expenses incurred by Steiner Tech during performance of Steiner Services, including, without limitation, numerous trips to China that Steiner made with Essick management to be introduced to and meet with management of the Steiner Tech Suppliers and to visit facilities thereof.   Exhibits 13 and 14.

***Examples of Specific Performance by Steiner Tech Under the Steiner Tech-Essick Contract***

88.     Following the execution of the Steiner Tech-Essick Contract in 2007 through the end of 2014, Steiner Tech provided substantial Steiner Services to Essick. Essick referred numerous technical, development, engineering, problem resolution, certification, components and product sourcing and manufacturing projects to Steiner Tech including product problem resolutions and new product design and feature development. Following is a brief description of nine examples of Steiner Services requested by Essick, provided by Steiner Tech, and received and utilized by Essick and from which Essick directly benefited and continues to benefit, all under the terms and conditions of the Steiner Tech-Essick Contract.

89.     Steiner Services Example 1: Essick Problem Resolution of Safety Problems Due To Essick Products Catching Fire in Customer Homes. In 2009, Essick requested Steiner at Steiner Tech to investigate and provide a solution to a safety problem Essick was having with some of the Essick Humidifiers overheating and catching fire during operation by customers. Exhibit 15. After research and a thorough investigation and analysis of the fires and the Essick product design by Steiner Tech, Steiner Tech determined the most probable cause of the humidifier fires and developed a solution thereto.   Steiner Tech presented its finding and

proposed solution to Essick. In response, Essick implemented the Steiner proposed solution and since doing so, Essick has not experienced any similar fires in its humidifier products.

90.     <u>Steiner Services Example 2</u>: Engineering Review and Support of Underwriters Laboratories, Inc. Review of Essick Products. In 2008, Essick requested that Steiner Tech provide engineering support to Essick in responding to an investigation by Underwriter Laboratories, Inc. (UL) of Essick Products. <u>Exhibit 16</u>. In response, Steiner provided Steiner Services that Essick lacked internally to enable Essick to respond to UL's investigation. This including providing Essick with engineering and development guidelines to enable the Essick printed circuit board ("PCB") to meet the UL's spacing and enclosure spacing requirements for 120 volt operation. In 2008, UL made changes to their electrical component requirements, and contacted Essick to have Essick review the Essick Products with respect to the changed UL standards. <u>Exhibit 17-19</u>.  Essick once again relied on Steiner Tech.  Steiner provided Essick a "UL file review" related to thermal protection of Essik's electric motor product compliance or identified required changes to the Essick Products to ensure Essick's Products continued to comply with the new UL requirements.  After approval by Essick, Steiner Tech coordinate the required changes to the Essick Products with the Steiner Tech Suppliers. As a result of these Steiner Services, UL provided Essick with the required UL certification on the Essick Products.

91.     <u>Steiner Services Example 3</u>: Essick Motor Noise Problem Resolution and Enhanced Essick Humidifier Fan Speed Features Provided Therefrom. In 2008, Essick requested Steiner at Steiner Tech to resolve a low motor speed and motor start up noise problem that Essick was having with the Essick Model 4D7 Humidifier (includes Models 4D7-2 and 4DTS). <u>Exhibit 20</u>.  In response, Steiner reviewed numerous different motors and motor controls, and found that none of them current Essick designs could meet Essick's low noise objectives. To

address this deficiency, Steiner spent considerable time reviewing options and alternative and initiate a program to develop a new motor and motor controller (referred herein as the "Steiner Controller"). After an initial design was developed, Steiner coordinated prototypes and refinement of the Steiner Controller with ProMotor. Exhibit 21. Steiner provided Essick the results of his review and presented his new Steiner Controller as an option to solve Essick's low motor speed noise problem. Exhibit 22. Essick tested the Steiner Controller and found it to be superior to Essick's prior controllers. Exhibit 23. As a result, Essick instructed Steiner Tech to implement the Steiner Controller in the Essick Model 4D7 humidifier. Steiner Tech coordinated the required licensing for manufacturing of the Steiner Controller first with ProMotor and then with Noke for use in the components and products sold to Essick. The Steiner Controller was so well received, Essick has since requested Steiner Tech to coordinate the implementation of the Steiner Controller in additional Essick humidifier models. Exhibit 24. Essick has implemented the Steiner Controller solutions in at least fifteen (15) different models of Essick humidifiers.

92.   Steiner Services Example 5: Steiner Licensing of Steiner's '086 Patent to Lowe's In Order For Essick To Obtain A Purchase Contract For a Lowe's Developed Humidifier. As addressed above, in 2012 Essick was negotiating a new supply contract with Lowe's ("Lowe's-Essick Purchase Agreement") (Exhibit 11, (Under Seal)) to develop and provide a new Essick Humidifier (Model IHUM-10-140) that would be sold by Lowe's ("Essick-Lowe's Humidifier") under their IDYLIS brand name. Exhibit 25. Essick requested Steiner Services for the design and development of the Essick-Lowe's IHUM-10-140 humidifier. After the product development was completed, in order to finalize the Lowe's-Essick Purchase Agreement, Lowe's required Essick to obtain from Steiner a license for the Steiner '086 Patent. Essick requested Steiner to extend a patent license to Lowe's ("Steiner-Lowe's '086 Patent License") for Steiner's "Motor

Technology" patents including the '086 Patent, which covered the motor used in numerous Essick Humidifiers including the Lowe's IHUM-10-140 model. Steiner was not a party to the Lowe's-Essick Purchase Agreement.  See Exhibit 11, Para. 1.0, Section 2.4(iii) (Under Seal). However, under the Steiner Tech-Essick Contract, Steiner agreed to grant the Steiner-Lowe's '086 Patent License to Lowe's as Steiner understood that he would receive payment of the Steiner Patent Premium to the '086 Patent through purchases Lowe's made from Essick.  As negotiated by Essick, Steiner granted the Steiner-Lowe's '086 Patent License to Lowe's only on the condition that "Lowe's issues one or more purchase orders to Essick Air, Inc. totaling, in aggregate, one million dollars or more for any humidifier products, . . ." Exhibit 10, Para. 2. This Steiner-Lowe's '086 Patent License stated "Licensor [Steiner] agrees and acknowledges that he will benefit if Lowe's issues the one or more purchase orders mentioned in Section 2 and that issuance of each purchase order provides sufficient consideration for the rights and privileges granted by Licensor [Steiner] to Licensee [Lowe's], without Licensee being charged any royalty or license fee relating to its use of the license." Exhibit 10, Para. 3. The Steiner-Lowe's '086 Patent License was negotiated with Lowe's by Chuck Davis, Essick's Vice President of Manufacturing, and Essick's outside counsel from the firm RatnerPrestia of Valley Forge, Pennsylvania. Exhibits 5-9.  As a direct benefit of Steiner granting Lowe's the Steiner-Lowe's '086 Patent License, Essick finalized the Essick-Lowe's Purchase Contract with Lowe's and has subsequently received purchase orders from Lowe's under that agreement that has since exceeded more than the one million dollar minimum in purchase orders.  Exhibits 9 and 10.

93.  Steiner Services Example 6: Redesign of the Electrical Circuit Control Voltage Protection for the Essick Cooler. In 2012, Essick requested  Steiner Tech investigate and resolve a problem it was having with a transient voltage spikes in certain Essick cooler that were causing

fires.  Exhibit 26.  In response, Steiner Tech reviewed the product design and developed several solutions to Essick.  Exhibit 27.  Essick implemented one of the Steiner Tech developed product changes on or about late 2013. In 2014, Essick notified Steiner Tech that Essick had not received any further reports of damage to the control units due to transient voltage spikes in any of the Essick Products that implemented the Steiner developed product change.

94.  Steiner Services Example 7: Redesign Of the Essick Humidifier For Sale In Europe. In 2011, a Dutch customer of Essick expressed an interest in purchasing the Essick Model E35 humidifier for sale in Europe if the product could be modified to meet European standards. Exhibits 28 and 29. Essick requested Steiner Tech to coordinate the development of a European version of the E35 Model Essick Humidifier including the redesign of its electrical components for European compliance. In response, Steiner Tech developed a redesigned the motor, control and various electrical components used in the E35 Model to create the European version of the E35 Model.  This included ensuring compliance with the European power requirements and European safety regulations including VDE and CE certifications. Steiner Tech coordinated the manufacturing of production "samples" for testing and approval by Essick and Essick's customer.  Essick received the redesign and samples from Steiner Tech, and after testing, Essick placed an initial order for the European version E35 Model Essick Humidifiers as provided by the Steiner Services.

95.  Steiner Services Example 8: Steiner Tech Coordination Of Development Of The New Pedestal Humidifier For Essick (Model EP9). In 2008, Essick requested Steiner Tech develop a new model of a humidifier. Essick provided Steiner Tech with general product features and a concept drawing of the outer shape and styling of a pedestal housing and requested that Steiner Tech coordinate the development of this new Essick model humidifier, referred herein as

23

the Essick EP9 humidifier. Exhibit 30 and 31. Over a period of nearly three (3) years and nearly 1,000 hours of expended time, Steiner Tech coordinated the development of Essick's new EP9 humidifiers including preparation and updates to the humidifier control specifications including specifying features and operation.  See Exhibits 32 and 33.  This included numerous proposed designs that ultimately utilized a one piece molded body and a new wireless remote control, both of which took considerable effort.  For example, the new wireless remote control development included required Federal Communication Commission (FCC) certification for the radio frequency transmitters. Exhibits 34, 35, and 36.  Steiner Tech oversaw the development work by Steiner Tech Suppliers of numerous different designs until one was finally approved by Essick. See Exhibit 37.   To accomplish this, Steiner made several trips to China and expended considerable funds over a three (3) period. Essick agreed to use Steiner Tech and the Steiner Tech Supplier for the one piece housing tooling as well as tooling for all other EP9 humidifier parts.  Exhibit 38. Once finalized, Essick began ordering and receiving the Steiner Tech developed EP9 humidifier, which has since been a very successful product for Essick.   In October 2010, the Steiner Tech developed EP9 humidifier received Do It Best's Member's Choice Award for Best New Product. Exhibit 39. Essick has since built and sold more than 100,000 of the Steiner Tech developed EP9 model humidifiers with over 25,000 units being built and sold during the 2014/2015 season alone. Exhibit 40.

96.    Steiner Services Example 9: Essick Product Sourcing and Supplier Management. From 2007 through 2014, Essick requested Steiner Tech and Steiner for Steiner's Services related to the manufacturing sourcing, management, component and product design coordination, component and product procurement, and quality control. Essick requested and relied on Steiner Services in the form of participation in and coordination of activities, contacts and meetings

between Essick and the Steiner Tech Suppliers that included Noke, ProMotor, ABJ and Man-Li, for the design and manufacturing of components for Essick as well as new features and new products. (See Exhibit 41 wherein Essick requests a new rotary control for the H12 Series humidifier).   Components and Essick Products thereby. These Steiner Services included direct participation and coordination in numerous meetings, emails and telephone calls as well as approximately two to three trips per year to China. Steiner coordinated and arranged for meetings with Chinese manufacturers with Essick management, including Chuck Davis, Vice President of Manufacturing and Scott Thomas, Engineering Manager. See Exhibits 13 and 14. This included meetings with management and visits top facilities of the Steiner Tech Suppliers in China (Noke, ProMotor, ABJ and Man-Li). Essick relied upon Steiner Services for the identification and screening of new or additional suppliers and manufacturers that became Steiner Tech Suppliers to provide Essick with components for the Essick Products as alternatives that might have lower costs to higher quality and/or lower cost. Steiner Tech made recommendations of new Steiner Tech Suppliers to Essick including, by way of example, Yan Feng, ProMotor, Noke, ABJ, Wellsum, Man-Li, Shenzhen Tech and JinBida. Steiner Tech identified, screened, and developed each new Steiner Tech Supplier to meet Essick's particular product and business needs. After receiving the recommendations from Steiner Tech, Steiner would make an introduction between Essick and the recommended Steiner Tech Supplier and would coordinate Essick's visits to the Steiner Tech Suppliers' facilities in China. As a result, Essick sourced their components and products from at least eight (8) Steiner Tech Suppliers between 2007 and 2014. At Essick's request, Steiner made trips to China with Essick management, including Chuck Davis, Vice President of Manufacturing at Essick, to visit various

Chinese manufacturers of components and products for Essick on at least nineteen (19) occasions between May 2007 and January 2014.

### The Steiner Tech-ProMotor Contract, The ProMotor '086 Patent License Agreement, and The ProMotor '378 Patent License Agreement

97.    As early as May 2000, Steiner established a business relationship with ProMotor as a source for electrical components including motors for supply to Steiner Tech customers such as Emerson.

98.    As early as May 2000, Steiner Tech performed a supplier screen and due diligence on ProMotor to determine its capabilities and manufacturing quality.

99.    Steiner Tech entered into a written agreement with ProMotor on July 31, 2002 (the "Steiner Tech-ProMotor Contract") establishing ProMotor as a Steiner Tech Supplier. Exhibit 42 (Under Seal).  The Steiner Tech-ProMotor Contract, inter alia, provided that for all projects and companies that Steiner Tech brought to ProMotor, ProMotor agreed to "For all project from those companies, [ProMotor] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to Professional Motor (Shzn.) Ltd [ProMotor] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 43 (Under Seal).

100.    Pursuant to deferred compensation arrangement under the Steiner Tech-Emerson Contract, Steiner Tech negotiated with ProMotor to provide that Steiner Tech would receive a commission from ProMotor for all sales to Essick resulting from the Steiner Tech-ProMotor Contract.  The amount of the commission was to be determined between the parties from time to time. The Steiner Tech-ProMotor Commission was later documented in a separate written agreement between Steiner Tech and ProMotor on June 11, 2005. Exhibit 43 (Under Seal).

101.    From 2002 through 2007, Emerson purchased ProMotor Products from ProMotor, and for all such purchases, Emerson paid a Steiner Services Premium to ProMotor as compensation for Steiner Services provided to Emerson by Steiner Tech.

102.    From 2002 through 2007 ProMotor paid the Steiner Services Premium it received from Essick to Steiner Tech as the Steiner Tech-ProMotor Commission for all sales made by ProMotor to Emerson.

103.    On June 11, 2005, Steiner Tech entered into a Steiner Tech-ProMotor '086 Patent License Agreement with ProMotor that granted ProMotor a limited, non-exclusive, non-transferable license to manufacture motors and sell them to Emerson (and subsequently to Essick) under the '086 Patent as well as Steiner's related patents in China, Vietnam, Canada, and Mexico. Exhibit 43 (Under Seal). The Steiner Tech-ProMotor '086 Patent License Agreement included the payment of a royalty for the '086 Patent for the manufacture and sale of motors to Emerson that practiced one or more of the claims of the '086 Patent.

104.    At least as early as 2006, ProMotor marked all motors manufactured and sold under the Steiner Tech-ProMotor '086 Patent License Agreement with the patent number of the '086 Patent.

105.    From 2002 through 2007, Emerson purchased motors from ProMotor that were covered by the Steiner Tech-ProMotor '086 Patent License Agreement, and for each, Emerson knowingly paid ProMotor the Steiner Patent Premium as an imbedded royalty for the '086 Patent.

106.    Upon information and belief, from 2002 through 2007 ProMotor paid the '086 Patent Royalty to Steiner Tech for all sales made by ProMotor to Emerson covered by the Steiner Tech-ProMotor '086 Patent License Agreement.

107.    Beginning in 2007, with Essick's acquisition of the Acquired Emerson Products, Steiner Tech introduced Essick to ProMotor as a supplier of the motor under the '086 Patent, as well as other products.

108.    Essick requested Steiner Tech provide Steiner Services related to ProMotor as a supplier and manufacturer of components and products to Essick, and at all times understood that Essick's deferred indirect compensation or reimbursement to Steiner Tech for such Steiner Services related to ProMotor manufacturing services was only fulfilled through the payment of the Steiner Services Premium paid by Essick to ProMotor.

109.    Essick had knowledge that the motors Essick purchased from ProMotor practiced the '086 Patent and that Steiner had licensed the '086 Patent to ProMotor such that the motors Essick purchased from ProMotor were duly licensed under Steiner's '086 Patent.  Essick also knew that the price paid by Essick to ProMotor for the motors included the payment by ProMotor to Steiner Tech of royalty under the '086 Patent such that Essick knew that the motors purchased from ProMotor and that Essick imported into the U.S. were licensed under the '086 Patent.  See Exhibit 4 (Under Seal).

110.    In 2008, after Steiner conceived of the new Steiner Controller, Steiner Tech requested the ProMotor build samples of the Steiner Controller for review and testing by Steiner Tech and Essick.

111.    In 2009, Steiner described the Steiner Controller in an application for patenting with the United States Patent and Trademark Office ("USPTO") that was filed on January 22, 2010. This patent application filing by Steiner resulted in the issuance of the '378 Patent (the Steiner Controller is also referred to as the "Steiner '378 Controller").

28

112.    In 2009, Steiner Tech granted ProMotor a limited, non-exclusive, non-transferable license to practice the Steiner Controller under the '378 Patent for sales by ProMotor to Essick under the Steiner Tech-ProMotor Contract and Steiner Tech-Essick Contract. This ProMotor '378 Patent License Agreement required payment of a patent royalty by ProMotor to Steiner Tech.

113.    In 2009, ProMotor manufactured, tested and provided samples of the Steiner Controller implementing the '378 Patent to Steiner Tech and provided the same to Essick.

114.    In 2009, Steiner Tech began working with ProMotor on a new touch screen controller as requested by Essick to provide a touch screen user interface to the Steiner Controllers. This resulted in a touch screen upgrade to the Essick 4D7 humidifier which subsequently became the Essick 4DTS with "TS" referring to touch screen.

115.    From 2009 to 2012, Essick ordered licensed Steiner Controllers from ProMotor and imported them into the United States, at which time, Essick paid the Steiner Patent Premium to ProMotor for each purchased licensed Steiner Controller.

116.    For all licensed Steiner Controllers purchased by Essick from ProMotor, ProMotor paid Steiner Tech a patent royalty under ProMotor '378 Patent License Agreement.

117.    From 2009 to 2012, Essick purchased and imported the ProMotor licensed Steiner Controllers into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price Essick paid to ProMotor included the Steiner Patent Premium under the Steiner Tech-Essick Contract and that such would subsequently be paid to Steiner Tech by ProMotor as the patent royalty under the ProMotor '378 Patent License Agreement.

118.    In 2012, Essick ceased purchasing licensed Steiner Controllers from ProMotor and shifted purchases to another Licensed Steiner Tech Supplier Noke.

119.    Through mid-2014, Steiner Tech continued to provide Steiner Services to Essick with regard to ProMotor.

120.    From late 2007 to 2014, Essick purchased, imported into the United States and sold ProMotor Products as Essick Components and Essick Products under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid by Essick to ProMotor included the Steiner Services Premium under the Steiner Tech-Essick Contract and that such would subsequently be paid to Steiner Tech by ProMotor as the Steiner Tech-ProMotor Commission. Exhibit 43 (Under Seal).

121.    Through the end of 2014, Essick paid the Steiner '086 Patent Royalty Premium as a portion of the payments for purchases made from ProMotor and ProMotor paid Steiner Tech the Steiner Tech-ProMotor Commission based thereon.

### The Steiner Tech-Noke Contract and The Noke '378 Patent License Agreement

122.    On or about April 2010, Steiner established a business relationship with Noke as a source for electrical components including power and motor controllers for Steiner Tech customers such as Essick.

123.    From April through June 2010, Steiner Tech performed a supplier screen and due diligence on Noke to determine Noke's capabilities and manufacturing quality.

124.    On June 30, 2010, Steiner Tech entered into a written agreement with Noke ("Steiner Tech-Noke Contract") establishing Noke as a Steiner Tech Supplier. The Steiner Tech-Noke Contract, among other terms, provided that for all projects and companies that Steiner Tech brought to Noke, Noke agreed "For all project from those companies, Shenzhen Noke

Technology Co. Ltd. [Noke] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to Shenzhen Noke Technology Co. Ltd. [Noke] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 44 (Under Seal).

125.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated the payment to Steiner Tech of a commission by Noke for all sales resulting from the Steiner Tech-Noke Contract, the amount of which was to be determined between the parties from time to time.

126.    On June 30, 2010, Steiner Tech introduced Essick to Noke during a meeting at Noke's office in China and coordinated Essick's review of Noke as a supplier to Essick. From this meeting, Essick agreed to use Noke as a supplier and recognized Noke as a Steiner Tech Supplier under the Steiner Tech-Essick Contract.

127.    From June 2010 through the middle of 2014, Essick requested Steiner Services for technical, manufacturing and sourcing of products from Noke Essick under the Steiner Tech-Essick Contract, which Essick accepted, relied on and benefited, including Steiner Tech's coordination of purchase orders from Essick to Noke and product deliveries from Noke to Essick.

128.    For all relevant times, as provided by the Steiner Tech-Essick Contract, at no time has Essick provided direct payment or compensation for Steiner Services provided to Essick with regard to Noke.   Essick has never directly paid Steiner Tech for these Steiner Services as Essick understood that Steiner Tech's compensation was through the deferred and indirect compensation by Essick as the Steiner Services Premium on all purchases from Noke, and that Noke would subsequently pay such as a commission to Steiner Tech.

129.    Through the end of 2014, Steiner Tech continued to provide Essick with Steiner Services related to management of supplier services with Noke.

130.    For all relevant times, Essick paid Noke a price for each purchase that included the Steiner Services Premium for the previously provided Steiner Services with full understanding and knowledge that the Steiner Services Premium portion of the price paid by Essick to Noke would subsequently be paid by Noke to Steiner Tech as the only compensation that Steiner Tech would receive for the Steiner Services provided to Essick.

131.    Noke paid Steiner Tech for all sales to Essick under the Steiner Tech-Noke Contract from 2011 through the end of 2014.

132.    In 2012, Steiner Tech granted Noke a limited, non-exclusive, non-transferable license to the Steiner Controller under the '378 Patent for sales by Noke to Essick under the Steiner Tech-Noke Contract. The Noke '378 Patent License Agreement provided for the payment of a royalty by Noke to Steiner Tech for the sale of Steiner Controllers to Essick of licensed Steiner Controllers.

133.    During 2012, Licensed Steiner Tech Supplier Noke manufactured, tested and provided samples of the Steiner Controller implementing the '378 Patent to Steiner Tech and Essick.

134.    In 2012, after review by Essick of the Noke-manufactured and licensed Steiner Controller, Essick began purchasing the Noke-manufactured licensed Steiner Controllers in lieu of their prior purchases from ProMotor under the ProMotor '378 Patent License Agreement.

135.    From 2012 through the end of 2014, Essick ordered licensed Steiner Controllers from Noke and imported the licensed Steiner Controllers into the United States, and incorporated

those licensed Steiner Controllers into Essick Products manufactured, offered to sell and sold in the United States.

136.    For all licensed Steiner Controllers purchased from Noke from 2012 through the end of 2014, Essick paid a Steiner Patent Premium to Noke under the '378 Patent and in return received a licensed Steiner Controller.

137.    For all licensed Steiner Controllers purchased by Essick from Noke from 2012 through the end of 2014, Noke paid Steiner Tech a patent royalty under Noke '378 Patent License Agreement.

138.    From 2012 to 2014, Essick purchased and imported the Noke licensed Steiner Controllers into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid to Noke was the Steiner Patent Premium under the Steiner Tech-Essick Contract that would subsequently be paid by Noke to Steiner Tech as a royalty under the Noke '378 Patent License Agreement.

139.    On February 4, 2013 with the issuance of the '378 Patent by the United States Patent and Trademark Office (USPTO) on February 12, 2013, Steiner instructed Noke to include the patent number of the '378 Patent on all Noke-produced Steiner Controllers.

140.    In February 2013, Noke began marking the Noke-manufactured licensed Steiner Controllers that it sold and provided to Essick with the '378 Patent Number directly on each Steiner Controller as instructed by Steiner. Exhibit 45.

141.    Beginning in February 2013 to the end of December 2014, Essick purchased, imported and used the '378 Patent marked Noke-manufactured licensed Steiner Controllers for assembly in the United States of Essick Products.

### *The Steiner Tech-Man-Li Contract*

142.    In October 2012, Steiner established a business relationship with Man-Li as a source of paper packaging materials and of owner and user manuals.

143.    During October 2012, Steiner Tech performed a supplier screen and due diligence on Man-Li to determine their capabilities and manufacturing quality.

144.    On October 10, 2012, Steiner Tech entered into a written agreement with Man-Li ("Steiner Tech-Man-Li Contract") establishing Man-Li as a Steiner Tech Supplier. The Steiner Tech-Man-Li Contract, among other terms, provided that for all projects and companies that Steiner Tech brought to Man-Li, Man-Li agreed "For all project from those companies, Man Li Paper Products Mfg. Co. Ltd [Man-Li] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to Man Li Paper Products Mfg. Co. Ltd [Man-Li] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 46 (Under Seal).

145.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated that payment by Man-Li to Steiner Tech of a commission for all sales resulting from the Steiner Tech-Man-Li Contract including sales to Essick, the amount of which was to be determined between the parties from time to time.

146.    On or about January 20, 2011, Steiner Tech arranged for a meeting between Man-Li and Essick at the China Office of Man-Li.

147.    After the January 2011 meeting, Essick selected Man-Li as a supplier to Essick and understood that Man-Li was a Steiner Tech Supplier, with Essick placing orders for Man-Li products through Steiner Tech.

34

148.    From the middle of 2011 through 2014, Essick purchased and imported Man-Li Products into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid by Essick to Man-Li was the Steiner Services Premium under the Steiner Tech-Essick Contract that would subsequently be paid by Man-Li to Steiner Tech as the Steiner Tech-Man-Li Commission.

149.    From the middle of 2011 through 2014, Man-Li paid Steiner Tech the Steiner Tech -Man-Li Commission for all sales to Essick under the Steiner Tech-Man-Li Contract.

### The Steiner Tech-ABJ Contract

150.    In or about early 2012, Steiner developed a relationship with ABJ to provide electrical components such as electric motors Steiner Tech customers.

151.    On September 22, 2012, Steiner Tech entered into a written agreement with ABJ ("Steiner Tech-ABJ Contract") establishing ABJ as a Steiner Tech Supplier. The Steiner Tech-ABJ Contract, among other terms, provided that for all projects and companies that Steiner Tech brought to ABJ, ABJ agreed "For all project from those companies, A Better Electrical Manufacturing Company. Ltd. [ABJ] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to A Better Electrical Manufacturing Company. Ltd. [ABJ] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 47 (Under Seal).

152.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated with ABJ to provide that ABJ would pay Steiner Tech a commission for all sales resulting from the Steiner Tech-ABJ Contract including sales to Essick, the amount of which was to be determined between the parties from time to time.

153.    From 2013 to 2014, Essick purchased and imported ABJ Products into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid by Essick to ABJ was the Steiner Services Premium under the Steiner Tech-Essick Contract that would subsequently be paid by ABJ to Steiner Tech as the Steiner Tech-ABJ Commission.

154.    From 2012 through the end of 2014, ABJ paid Steiner Tech under the Steiner Tech-AGJ Contract the Steiner Tech-ABJ Commission for all sales to Essick under the Steiner Tech-ABJ Contract.

### The Steiner Tech-Wellsum Contract

155.    In or about early 2010, Steiner development a relationship with Wellsum to provide electrical components such as electric motors to Essick for use by Essick in the manufacturing of Essick Products.

156.    Steiner Tech entered into a written agreement with Wellsum on October 29, 2012 ("Steiner Tech-Wellsum Contract") establishing Wellsum as a Steiner Tech Supplier. The Steiner Tech-Wellsum Contract, among other terms, provided that for all projects and companies that Steiner Tech brought to Wellsum, Wellsum agreed "For all project from those companies, Wellsum Electrical Co. [Wellsum] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to Wellsum Electrical Co. [Wellsum] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 48 (Under Seal).

157.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated for Wellsum to pay Steiner Tech a commission ("Steiner Tech-Wellsum Commission") for all sales

resulting from the Steiner Tech-Wellsum Contract including sales to Essick, the amount of which was to be determined between the parties from time to time.

158.    From 2010 to 2014, Essick purchased and imported Wellsum Products into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid by Essick to Wellsum was the Steiner Services Premium under the Steiner Tech-Essick Contract that would subsequently be paid by Wellsum to Steiner Tech as the Steiner Tech-Wellsum Commission.

159.    From 2010 through the end of 2014, Wellsum paid Steiner Tech the Steiner Tech-Wellsum Commission under the Steiner Tech-Wellsum Contract for all sales to Essick.

**_The Steiner Tech-Yang Feng Contract and The Yang Feng '086 Patent License Agreement_**

160.    As early as 1999, Steiner development a relationship with Yang Feng to provide electrical components such as motors for use by Emerson in the manufacturing of Emerson Products such as humidifiers.  Exhibit 49 (Under Seal).

161.    Steiner Tech entered into a written agreement with Yang Feng on June 4, 1999 ("Steiner Tech-Yang Feng Contract") establishing Yang Feng as a Steiner Tech Supplier. The Steiner Tech-Yang Feng Contract, among other terms, provided with regard to motor project brought to Yang Feng by Robert E. Steiner: "For all such motor projects, Yang Feng Electric Factory [Yang Feng] agrees that it will deal only through Robert E. Steiner or company to be established by Robert E. Steiner and will not deal directly with any company brought to Yang Feng Electric Factory [Yang Feng] by Robert E. Steiner." Exhibit 50 (Under Seal).

162.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated for payment by Yang Feng to Steiner Tech of a commission ("Steiner Tech-Yang Feng

Commission") for all sales resulting from the Steiner Tech-Yang Feng Contract including sales to Emerson, the amount of which was to be determined between the parties from time to time.

163.    From 1999 through 2007, Emerson purchased Yang Feng Products from Yang Feng, and for all such purchases, Emerson paid a Steiner Services Premium to Yang Feng as compensation for Steiner Services provided to Emerson by Steiner Tech.

164.    From 1999 through 2007, Yang Feng paid the Steiner Tech-Yang Feng Commission to Steiner Tech for all sales made by Yang Feng to Emerson.

165.    In 2005, Steiner Tech entered into a Steiner Tech-Yang Feng '086 Patent License Agreement with Yang Feng that granted Yang Feng a limited, non-exclusive, non-transferable license to manufacture motors and sell them to Emerson and subsequently to Essick under the '086 Patent as well as Steiner's related motor patents in China, Vietnam, Canada, and Mexico. Exhibit 50 (Under Seal).

166.    . The Steiner Tech-Yang Feng '086 Patent License Agreement included the payment of a '086 Patent Royalty for the sale of motors practicing the '086 Patent.

167.    At least as early as 2000, Yang Feng marked all motors manufactured and sold under the Steiner Tech-Yang Feng '086 Patent License Agreement with the patent number of the '086 Patent.

168.    From 1999 through 2007, Emerson purchased motors from Yang Feng that were covered by the Steiner Tech-Yang Feng '086 Patent License Agreement, and for each, Emerson paid Yang Feng the '086 Patent Royalty.

169.    From 1999 through 2007, Yang Feng paid the '086 Patent Royalty to Steiner Tech for all sales made by Yang Feng to Emerson covered by the Steiner Tech-Yang Feng '086 Patent License Agreement.

170.    Beginning in 2007, with Essick's acquisition of the Acquired Emerson Products, Steiner Tech introduced Essick to Yang Feng and continued to represent Essick to Yang Feng.

171.    Essick requested Steiner Tech continue to provide Steiner Services related to Yang Feng as a supplier and manufacturer of Essick Components and Essick Products to Essick, and at all times Essick understood that the deferred indirect compensation or reimbursement to Steiner Tech for Steiner Services related to Yang Feng manufacturing services was accomplished through the Steiner Services Premium paid by Essick to Yang Feng.

172.    Essick knew that the products and components provided by Yang Feng to Essick practiced the '086 Patent and that Steiner had licensed the '086 Patent to Yang Feng. Essick knew that the motors Essick purchased from Yang Feng included a license to the '086 Patent and that the price paid by Essick to Yang Feng for the licensed motors included the payment by Yang Feng to Steiner Tech of a patent royalty under the '086 Patent. Essick knew and relied on the Steiner Tech license to Yang Feng to ensure that the motors purchased from Yang Feng and imported into the U.S. by Essick were duly licensed under the '086 Patent.

173.    From 2007 to 2010, Steiner Tech continued to provide Essick with Steiner Services related to Yang Feng Products.

174.    From 2007 to 2010, Essick purchased Yang Feng Products from Yang Feng and imported the Yang Feng Products into the United States as Essick Components and Essick Products.

175.    From 2007 through the end of 2010, Essick paid the Steiner '086 Patent Royalty Premium as a portion of the payments for purchases made from Yang Feng and Yang Feng paid Steiner Tech the Steiner Tech-Yang Feng Commission.

***The Steiner Tech-JinBida Contract and The JinBida '086 Patent License Agreement***

176.    In or about early 2010, Steiner developed a relationship with JinBida Electrical Co. Ltd. ("JinBida") to provide electrical components including motors to Essick for use by Essick in the manufacturing of Essick Products.

177.    Steiner Tech entered into a written agreement with JinBida on October 29, 2010 ("Steiner Tech-JinBida Contract") establishing JinBida through Wellsum as a Steiner Tech Supplier. The Steiner Tech-JinBida Contract, among other terms, provided with regard to motor projects brought to JinBida by Robert E. Steiner, JinBida would not deal directly with any company brought to JinBida by Robert E. Steiner. Exhibit 51 (Under Seal).

178.    Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated to receive payment from JinBida of a commission ("Steiner Tech-JinBida Commission") through Wellsum for all sales resulting from the Steiner Tech-JinBida Contract including sales to Emerson and Essick, the amount of which was to be determined between the parties from time to time.

179.    In 2010, Steiner Tech entered into a Steiner-JinBida '086 Patent License Agreement with JinBida that granted JinBida a limited, non-exclusive, non-transferable license to sell licensed motors to Essick under the '086 Patent as well as Steiner's related motor patents in China, Vietnam, Canada, and Mexico. Exhibit 51 (Under Seal). The Steiner-JinBida '086 Patent License Agreement included the payment of a '086 Patent Royalty for the manufacture or sale of motors under the '086 Patent.

180.    In 2010, Steiner Tech introduced Essick to JinBida as a possible source for Essick Components, namely motors.

181.    At least as early as 2011, JinBida marked all motors manufactured and sold under the Steiner-JinBida '086 Patent License Agreement with the patent number of the '086 Patent.

182.    Essick requested Steiner Tech provide Steiner Services related to JinBida as a supplier and manufacturer of Essick Components and Essick Products to Essick, and at all times understood that the deferred indirect compensation and reimbursement to Steiner Tech for Steiner Services was through the Steiner Services Premium paid by Essick to JinBida.

183.    Essick knew that the Essick Products and Essick Components provided by JinBida to Essick practiced the '086 Patent and that Steiner had licensed the '086 Patent to JinBida. As such, Essick knew that the products Essick purchased from JinBida included a license to the '086 Patent and that the price paid by Essick to JinBida for the motors included the payment by JinBida to Steiner Tech of a royalty under the '086 Patent. As such, Essick knew and relied on such arrangement to ensure that the motors purchased from JinBida and imported into the U.S. by Essick were duly licensed under the '086 Patent.

184.    From 2010 to 2014, Steiner Tech continued to provide Essick with Steiner Services related to JinBida Products.

185.    From 2011 to 2014, Essick purchased JinBida Products from JinBida and imported the JinBida Products into the United States as Essick Components and Essick Products.

186.    From 2011 through 2014, Essick purchased motors from JinBida that were covered by the Steiner-JinBida '086 Patent License Agreement, and for each, Essick paid JinBida the '086 Patent Royalty.

187.    From 2011 to 2014, Essick purchased and imported JinBida Products into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid to JinBida was the Steiner Services Premium under the Steiner Tech-Essick Contract that the Steiner Services Premium would subsequently be paid to Steiner Tech by JinBida as the Steiner-JinBida Commission.

188.     From 2011 through 2014, Essick paid the Steiner '086 Patent Royalty Premium as a portion of the payments for Essick purchases made from JinBida, and from such payments.

*189.*     From 2011 through 2014, JinBida paid the '086 Patent Royalty to Steiner Tech for all sales made by JinBida to Essick covered by the Steiner-JinBida '086 Patent License Agreement.

### The Steiner Tech-Shenzhen Tech Contract

190.     On or about early 2012, Steiner developed a relationship with Shenzhen Wu Sin Yuan Technology-Co., Ltd. ("Shenzhen Tech") to provide plastic parts to Noke and to Essick for use by Essick in the manufacture of Essick Products.

191.     Steiner Tech entered into a written agreement with Shenzhen Tech on or about September 26, 2012 (Steiner Tech-Shenzhen Tech Contract) establishing Shenzhen Tech a Steiner Tech Supplier. The Steiner Tech-Shenzhen Tech Contract, among other terms, provided that for all projects and companies that Steiner Tech brought to Shenzhen Tech, Shenzhen Tech agreed to "For all project from those companies, Shenzhen Wu Sin Yuan Technology-Co., Ltd [Shenzhen Tech] . . . will deal only through Robert E. Steiner or a company established by Robert E. Steiner and will not deal directly, or through another company, with any company brought to Shenzhen Wu Sin Yuan Technology-Co., Ltd [Shenzhen Tech] by Robert E. Steiner directly or through an agent authorized by Robert E. Steiner." Exhibit 52 (Under Seal).

192.     Pursuant to the Steiner Tech-Essick Contract, Steiner Tech negotiated for payment by Shenzhen Tech of a commission to Steiner Tech for all sales resulting from the Steiner Tech-Shenzhen Tech Contract, the amount of which was to be determined between the parties from time to time.

193.    Beginning in 2012, Steiner Tech introduced Essick to Shenzhen Tech and arranged for Shenzhen Tech to be a new supplier and manufacturer of Essick Components to Essick and coordinated purchase orders from Essick to Shenzhen Tech.

194.    From 2012 through 2014, Essick requested Steiner Tech provide Steiner Services related to Shenzhen Tech being a supplier and manufacturer of Essick Components and Essick Products to Essick, and at all times understood that the deferred indirect compensation or reimbursement to Steiner Tech for Steiner Services related to Shenzhen Tech manufacturing services was through the Steiner Services Premium paid by Essick to Shenzhen Tech.

195.    From 2012 through 2014, Steiner Tech continued to provide Essick with Steiner Services related to Shenzhen Tech products.

196.    At all relevant times, Essick understood and paid Shenzhen Tech, or Noke whom then paid Shenzhen Tech, a price that included the Steiner Services Premium for Steiner Services rendered by Steiner Tech to Essick.

197.    From 2012 to 2014, Essick directly purchased or indirectly purchased through Noke, the same Shenzhen Tech Products, and imported the same into the United States under the Steiner Tech-Essick Contract with full understanding and knowledge that a portion of the price paid to Shenzhen Tech was the Steiner Services Premium under the Steiner Tech-Essick Contract that would subsequently be paid by Shenzhen Tech to Steiner Tech as the Steiner Tech-Shenzhen Commission.

198.    From 2012 through the end of 2013, Shenzhen Tech paid Steiner Tech the Steiner Tech-Shenzhen Tech Commission for all sales to Essick under the Steiner Tech-Shenzhen Tech Contract.

### The Essick-Futec Contract and Unauthorized License

199.   Upon information and belief, Essick has a contract with Futec for Futec's manufacturing and supplying of components and products to Essick that Essick imports into the United States.

200.   Upon information and belief, Essick has provided and continues to provide Futec with specifications and samples of components from which Futec designs and establishes manufacturing or sourcing of various components for sale to Essick,

201.   Upon information and belief, Essick purchases the Futec-manufactured and sourced components from Futec as Essick Components, imports such Essick Components into the United States, and assembles in the United States the Essick Products, namely humidifiers, and offers for sale and sells the Essick Products having the Futec sourced components in the United States, including Missouri, and Europe and other countries. Essick sells these products through on-line stores such as Amazon, as well as nationwide retail chain stores, including, but not limited to Home Depot, Lowe's, Sears, Menards, and Ace Hardware (Essick Customers).

202.   Upon information and belief, Essick purchases Futec manufactured and assembled Futec humidifiers from Futec as Essick Products, imports these Futec humidifiers as Essick Products into the United States, and offers the same for sale and sells these Essick Products in the United States including the Eastern District of Missouri, and also in Europe and other countries. Essick sells these products through on-line stores such as Amazon, as well as nationwide retail chain stores, including, but not limited to Home Depot, Lowe's, Sears, Menards, and Ace Hardware (Essick Customers).

*Essick's Malfeasance*

203.     In or about 2012, Essick began negotiating the redirection of purchases of Essick Components and Essick Products from Steiner Tech Suppliers to other suppliers, based largely, if not solely, on Essick's intentional effort to eliminate Essick's required payment of the Steiner Services Premium and the Steiner Patent Premium to the Steiner Tech Suppliers as required by the Steiner Tech-Essick Contract.

204.     Beginning in 2012, Essick continued to utilize Steiner Services but simultaneously initiated steps to eliminate Essick's payment of the deferred compensation thereof by eliminating the Steiner Services Premium and the Steiner Patent Premium for each Essick Component and Essick Product purchased.

205.     In 2012, contrary to the terms of the Steiner Tech-Essick Contract, Essick began negotiating with Futec to obtain Essick Components and Essick Products from Futec rather than Steiner Tech Suppliers.

206.     In 2013, Essick began purchasing Essick Components and Essick Products from Futec rather than Steiner Tech Suppliers with the result being that Steiner Tech no longer received the deferred indirect compensation for Steiner Services that Steiner Tech had provided Essick related to those Essick Components and Essick Products, including, but are not limited to, Essick Models EA1201, EA1208, 7VH12 300HB, 7VH12 400HB, 7V447 400HB, 7V696 400HB, and 696800.

207.     Upon information and belief, as early as 2012, Essick provided samples of the licensed Noke-manufactured Steiner Controller to Futec and requested Futec to develop a Futec version of the Steiner Controller that Essick would buy from Futec rather than from Licensed Steiner Tech Supplier Noke. Based on this effort, Futec developed a competing Futec version of

the Steiner Controller that practices the '378 Patent without authorization from Steiner or Steiner Tech.

208.    Beginning in 2013, Essick began purchasing and importing into the U.S. the Futec-manufactured version of the Steiner Controller, rather than purchasing licensed Steiner Controllers from Licensed Steiner Tech Supplier Noke. Essick knew at all times that Futec was not a Licensed Steiner Tech Supplier. Essick further knew that purchases made by Essick to Futec for such knock-off Steiner Controllers did not include payment of the Steiner Patent Premium or the Steiner Services Premium.

209.    Beginning as early as July 2014, Essick unilaterally changed the practice that first started in 2007 at the formation of the Steiner Tech-Essick Contract of providing Steiner Tech with copies of all purchase orders and communications between Essick and the Steiner Tech Suppliers.

210.    Beginning at least as early as July 2014, Essick began negotiating directly with Steiner Tech Suppliers, including, but not limited to, ProMotor, Noke, ABJ, Man-Li, Shenzhen Tech, and JinBida, to eliminate Steiner Tech from Essick's dealings with these Steiner Tech Suppliers and to eliminate Essick's further deferred payments in the form of Steiner Services Premium as well as payment of the Steiner Patent Premium in its per-unit cost payments to these Steiner Tech Suppliers.

211.    During these negotiations in 2014 between Essick and each of the Steiner Tech Suppliers, Essick knew that by going directly to each of these Steiner Tech Suppliers and requested from each Steiner Tech Supplier the identification of amounts that each Steiner Tech Supplier was paying to Steiner Tech as a commission.  Essick attempted to negotiate its pricing with the Steiner Tech Suppliers with the specific aim to eliminate or reduce Essick's payment of

the Steiner Services Premium and the Steiner Patent Premium so that Steiner Tech would no longer receive the Steiner Services Premium and therefore Essick would fail to fully compensate Steiner Tech for Steiner Services provided to Essick.

212.   On December 10, 2014, in response to Steiner Tech's December 8, 2014 letter to Essick's Davis (Exhibit 12 (Under Seal)) that included the Pending Project List Dec 2014 that listed the current fifteen (15) pending Steiner Service projects being performed for Essick, Essick's Davis sent Steiner an email correspondence stating that he "will review them on an individual bases and get back with you once our humidifier season is over." Exhibit 53.

213.   Upon information and belief, beginning as early as January 1, 2015, Essick has purchased and continues to purchase Essick Components and Essick Products directly from Steiner Tech Suppliers, including, but not limited to, ProMotor, Noke, ABJ, Man-Li, Shenzhen Tech, and JinBida, with full knowledge that Essick is not paying the Steiner Services Premium to each of these Steiner Tech Suppliers and therefore these Steiner Tech Suppliers are no longer making the deferred payments to Steiner Tech for Steiner Services Steiner Tech has provided to Essick.

214.   Upon information and belief, beginning as early as January 1, 2015, Essick has purchased and continues to purchase Essick Components and Essick Products directly from at least Noke structured by Essick such that Essick would be buying the Steiner Controllers from Noke while failing to pay the Steiner Patent Premium to Noke.

215.   Beginning as early as 2013, Essick offered for sale and sold Essick Products that practice the '378 Patent without a license from Steiner or Steiner Tech, such sales being made by Essick through Amazon.com as well as numerous national retail stores including, but are not

limited to, Lowe's, Home Depot, Lowe's, Sears, Menards, and Ace Hardware that are located throughout the U.S. including the state of Missouri.

216.    Further as early as January 1, 2015, Essick continued to purchase motors from Steiner Tech Suppliers such as ProMotor that Essick knew were manufactured in China under Steiner's Chinese '086 Patent and that these Steiner '086 Motors that Essick had ProMotor manufacture in China since January 1, 2015 were made in violation of Chinese patent law.

217.    In or about September 2014, Essick abruptly ceased communicating with Steiner and began communicating directly with the Steiner Tech Suppliers for the purchase of Essick Components and Essick Products from the Steiner Tech Suppliers.

218.    In or about September 2014, Steiner became concerned with Essick's lack of communication and the lack of orders being placed by Essick on Steiner Tech for purchases from the Steiner Tech Suppliers, at which time Steiner attempted to contact Essick by telephone and email to inquire as to Essick's change of business practice.

219.    Having not received a satisfactory response from Essick, Steiner and Steiner Tech became concerned over the status of the contracts and relationship with each of the Steiner Tech Suppliers, and the actions by Essick that were contrary to the Steiner Tech-Essick Contract, including, but not limited to, Essick's obligation regarding Essick's deferred payment to Steiner Tech for prior Steiner Services rendered and for Essick's purchasing of non-licensed products practicing one or more of the Steiner Patents.

220.    Having not received an adequate response from Essick and having subsequently discovered the extent of Essick's tortious acts, Steiner and Steiner Tech have reluctantly had to seek resolution and full compensation for Essick's wrongful act from this Court.

## COUNT I – PATENT INFRINGEMENT

221.   Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

222.   Steiner is the owner, by virtue of his being the sole inventor, of the entire right, title and interest in and to United States Patent No. 8,373,378 entitled "Systems and Method for Motor Speed Control," granted February 12, 2013 (hereinafter referred to as the " '378 Patent").

223.    For all times relevant herein, Steiner Tech has had a license from Steiner to commercialize the '378 Patent including the right to sub-license the '378 Patent to select Licensed Steiner Tech Suppliers.

224.   The '378 Patent previously published on July 28, 2011 as United States Patent Publication No. 2011/0181226, entitled "Systems and Method for Motor Speed Control," and containing the same claims as subsequently issued in the '378 Patent without amendment during prosecution, and as such, as early as the publication of the '378 Patent on July 28, 2011, Essick either knew or should have known that, Steiner, being the inventor and owner of the numerous patents including the '086 Patent, would also be patenting the Steiner Controllers as conceived by Steiner.

225.   Steiner complied with 35 U.S.C. § 287(a) by placing notice of the Letters Patent on the control board assemblies manufactured by Noke from on or about February 2013 through December 2014 that embody the patented system of the invention of the '378 Patent that were made by Noke under the Steiner Tech-Noke '378 Patent License Agreement.

226.   As Steiner had numerous patents and Essick already knew that Essick utilized Steiner's '086 Patent in numerous Essick Products, Essick knew, or should have known, that

49

Steiner would seek or had sought patent protection for Steiner's conceived and invented Steiner Controller.

227. Essick knew that Steiner had numerous patents including the '086 Patent for the motor used in various Essick Products. As addressed herein below, Essick was required to get Steiner to grant a license to the '086 Patent to Lowe's in 2011. At that time, while Lowe's required a license to the '086 Patent, Essick management and attorneys for Essick recognized that the Essick Products utilized the Steiner Patents, but relied on the patent licensing through the Steiner Tech Suppliers rather than seek out, obtain and pay for a direct patent license from Steiner or Steiner Tech. Further, as addressed below, the Essick negotiated '086 patent license agreement between Steiner and Lowes's included a recognition that Steiner's consideration for entering into the Steiner-Lowe's '086 Patent License with Lowe's was that Steiner "would benefit if Lowe's issues the one or more purchase orders mentioned in Section 2 and that issuance of each purchase order provides sufficient consideration for the rights and privileges granted by Licensor [Steiner] to Licensee [Lowe's], without Licensee being charged any royalty or license fee relating to its use of the license." Exhibit 10, Para. 3.

228. The filing and serving of this Complaint, further gives actual notice to Defendants of their infringement of the '378 Patent.

229. From 2009 through 2012, Steiner Tech licensed the '378 Patent to ProMotor under the ProMotor '378 Patent License Agreement for sale of licensed Steiner Controllers to Essick which required payment of the Steiner '378 Patent Premium.

230. From 2012 through 2014, Steiner Tech licensed the '378 Patent to Noke under the Noke '378 Patent License Agreement for sale of licensed Steiner Controllers to Essick which required payment of the Steiner '378 Patent Premium.

231.    For all relevant times, Essick has not been authorized under and has never received a license from Steiner or Steiner Tech to practice the '378 Patent and is therefore not authorized under the '378 Patent.

232.    At all times since at least 2013, Essick knew that the price paid to Noke for the Noke-manufactured Steiner Controller included a patent royalty to the '378 Patent as a portion of the payments for purchases made by Essick from Noke, and that such Steiner Patent Premium paid to Noke was the only royalty payment being paid by Essick under the '378 Patent as Essick did not otherwise have a license to the '378 Patent except through Noke.

233.    Essick knew that the Noke produced Steiner Controllers that were purchased and imported by Essick since as early as February 2013 were covered by the '378 Patent as Noke started marking the Noke produced Steiner Controllers with Steiner's '378 Patent in February 2013, the month that the '378 Patent issued. See by way of examples, Exhibit 54 which is an email from Scott Thomas, Essick's Engineering Manager, sent to Noke with an attached photo of the Noke controller for the EP9 pedestal humidifier with Steiner's '378 Patent number printed on the PCB board; Exhibit 55 which is an email sent by  Harry Moore, Essick's Plant Quality Manager, to Steiner with a photo of the disassembled controller from the Lowe's IDYLIS humidifier showing Steiner's '378 Patent number printed thereon; Exhibit 56 which is an email from Essick's Harry Moore sent to Steiner regarding the controller for the model 1B72320 humidifier requesting corrective action and having an image attached of the Noke controller with Steiner's '378 Patent number printed on the PCB board; and Exhibit 57 which is an email from Essick's Harry Moore to Steiner to address a sticking button issue and attaching images of the Noke controller with Steiner's '378 Patent number printed on the PCB board.  As such, it is clear that Essick knew that Essick was buying the Steiner Controllers from Noke that were covered by

the '3787 Patent.  As such, Essick knew that Essick's payments to Noke would no longer include the Steiner Patent Premium and as such Noke would not be paying the Steiner Patent Premium to Steiner Tech. As such, Essick knew that since January 1, 2015 that Noke made Steiner Controllers that practiced the '378 Patent that were not licensed and that Essick's purchased and imported Steiner Controllers included the markings of the '378 Patent.

234.   Beginning as early as January 1, 2015, Essick has purchased and continues to purchase Essick Components and Essick Products directly from Noke structured by Essick such that Essick would be buying the Steiner Controllers from Noke while failing to pay the Steiner Patent Premium to Noke. As a direct result, Noke would fail to pay the patent royalties to Steiner Tech for practicing the '378 Patent. As such, Essick knew that the Steiner Controllers that Essick was purchasing from Noke were not licensed by Steiner Tech and therefore knew that they were purchasing, importing, using, offering for sale and selling, Essick Components and Products that were not authorized by Steiner or Steiner Tech and therefore were infringing the '378 Patent.

235.   As early as 2012, Essick provided samples of the Noke-licensed Steiner Controller to Futec and requested Futec to develop an infringing Futec version of the Steiner Controller that Essick with the intent that Essick would buy unlicensed Steiner Controllers from Futec without having to pay the Steiner '378 Patent Premium. In response to the request from Essick, Futec developed a competing Futec version of the Steiner Controller that infringes the '378 Patent.

236.   For all relevant times, Futec has not been authorized or has any right or license to practice the '378 Patent owned by Steiner.

237.   Beginning in 2013, Essick began purchasing and importing into the United States, Futec's infringing version of the Steiner Controller both as a component that Essick then

incorporated in Essick's manufacture of Essick Products and a included in Futec's manufactured and assembled Futec humidifiers that Essick sold as Essick Products.

238.   Since at least 2013, Essick has purchased from Futec and imported into the United States, offered for sale and sold in the United States Essick Products that practiced and continue to practice the '378 Patent without authorization from Steiner or Steiner Tech.  Exhibits 58, 59, and 60.

239.   Essick has directly infringed the '378 Patent including, but not limited to, independent system claims 1, 9 and 20 and independent method claim 15, as well as one or more dependent claims 2-8, 10-14, and 16-19 by having and continuing to use, offering for sale, sale and import into the United States and within this District Essick Components and Essick Products that included the Steiner Controller without authorization from Steiner or Steiner Tech, all in violation of 35 U.S.C. § 271(a), and Essick will continue to infringe the '378 Patent unless enjoined by this Court.

240.   As Essick knew that the Steiner Controller was patented, and rather than seeking a license from Steiner or Steiner Tech or continuing to purchase licensed Steiner Controllers, Essick intentionally sought to eliminate payment of the commissions to Steiner Tech that included the Steiner Tech '378 Royalties, but should have

241.   Essick has induced the infringement of, and/or contributorily infringed the '378 Patent including, but not limited to, independent system claims 1, 9 and 20 and independent method claim 15, as well as one or more dependent claims 2-8, 10-14, and 16-19, by selling in the United States and within this District Essick Products to Essick's customers with the intent of their reselling the unlicensed Essick Products, including, but not limited to, Home Depot, Lowe's, Sears, Menards, and Ace Hardware. As Essick had prior knowledge of the '378 Patent,

Essick's acts of selling these unlicensed Essick Products to these retailers is in violation of 35 U.S.C. § 271(b) and (c), and such acts will continue to infringe the '378 Patent unless enjoined by this Court.

242.    The Essick Products that have been initially identified as practicing without authorization one or more of independent system claims 1, 9 and 20 and independent method claim 15, as well as one or more dependent claims 2-8, 10-14, and 16-19 of the '378 Patent ("Infringing Products"), include by way of example:

a) Essick humidifiers with controllers manufactured by Futec and imported by Essick since 2013 having Essick Models EA1201, EA1208, 7VH12 300HB, 7VH12 400HB, 7V447 400HB, 7V696 400HB, and 696800; and

b) Essick humidifiers with controllers manufactured by Noke and imported by Essick since January 1, 2015 having Essick Models Sears Kenmore 14416, Sears Kenmore (Canada) 29974, HD1409, EA 1407, Sears Kenmore 15420, Sears Kenmore (Canada) 29614, 7V4DTS 300, 7V4DTS 900, 7VEP9 500, EP9800, EP9R800, and the Lowe's IHUM-10-140.

243.    Each of these Infringing Products are known to directly infringe Steiner's '378 Patent as Essick instructed Steiner Tech to implement the Steiner Controller in each of these Infringing Products.

244.    As such, Essick's infringement of the '378 Patent has been and is willful because Essick knew of the '378 Patent and knew that the Essick Products as purchased from Futec since 2012 and purchased from Noke since 2014 and imports into the United States practices the '378 Patent, and yet continues to import, use, offer for sale and sell Essick Products using unlicensed Steiner Controllers in at least reckless disregard of Steiner's patent rights.

245.    Steiner and Steiner Tech are entitled to recover from Essick the damages sustained by Steiner and Steiner Tech as a result of Essick's wrongful acts in an amount subject to proof at trial.

246.    Essick's past and continuing infringement of the '378 Patent has and continues to cause monetary damage and irreparable injury to Steiner and Steiner Tech, and will continue to do so unless and until Essick's infringement is enjoined by this Court.

## COUNT II – FALSE PATENT MARKING

247.    Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

248.    For all times relevant herein, Steiner was and has been the exclusive owner of the '378 Patent and had the exclusive right to mark products that practice the claims of the '378 Patent with the '378 Patent number.

249.    Steiner complied with 35 U.S.C. § 287(a) by placing notice of the Letters Patent on the control board assemblies manufactured by Noke from on or about February 2013 through December 2014 that embody the patented system of the invention of the '378 Patent that were made by Noke under the Steiner Tech-Noke '378 Patent License Agreement.

250.    However, as of January 1, 2015, due to Essick interference with the Steiner Tech-Noke Contract and Essick's breach of the Steiner Tech-Essick Contract, the Steiner Tech-Noke '378 Patent License Agreement was also terminated. As such, as of January 2, 2015 Noke is no longer licensed under the '378 Patent.

251.    Upon information and believe, Essick has purchased Steiner Controllers from Noke after the termination of the Steiner Tech-Noke '378 Patent License Agreement and Noke

has continued to mark the Steiner Controllers that it manufactures and sells to Essick with the patent number of the '378 Patent, and Essick has continued to import, use, offer to sell and has sold Essick Components and Essick Products that have the '378 Patent number affixed thereto. All without authorization or license from Steiner or Steiner Tech.

252.   The Essick Products that have been initially identified as practicing without authorization one or more of claims 1-20 of the '378 Patent, include by way of example Essick humidifiers imported by Essick since January 1, 2015 having Essick Model Numbers Sears Kenmore 14416, Sears Kenmore (Canada) 29974, HD1409, EA 1407, Sears Kenmore 15420, Sears Kenmore (Canada) 29614, 7V4DTS 300, 7V4DTS 900, 7VEP9 500, EP9800, EP9R800, and Lowe's IHUM-10-140.

253.   As such, these and other Steiner Controllers as manufactured by Noke and imported into the United States by Essick, and assembled into Essick humidifiers since January 1, 2015 have been falsely marked with the '378 Patent number without the consent of Steiner and therefore Essick has falsely marked its products under 35 U.S. C. §292.

254.   As such, Essick should be fined $500 for each and every offense of false marking as defined by 35 U.S. C. § 292. Steiner and Steiner Tech are entitled to an award of one half of the penalty levied upon Essick with the other half provided for the use of the United States as provided by 35 U.S. C. § 292.

## COUNT III – FALSE ASSOCIATION AND REPRESENTATION

255.   Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

256.   This Count III arises under the Federal Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

257.    Essick is now and has been advertising and promoting its products in commerce within the United States by misrepresenting the characteristics, exclusivity, and qualities of its products, in violation of 15 U.S.C. §1125(a).

258.    Essick is now and has been advertising and promoting its products in commerce within the United States by using the patent markings as a word, term, and symbol as a false designation of origin, as a false or misleading description of fact, and as a false and misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Essick with Steiner and/or Steiner Tech or as to the origin, sponsorship, or approval of such Essick's Products by another person and has imported into the United States such product with falsely associated patent markings.

259.    The Essick Products that have been initially identified as using the false and misleading representation, connection or association with Steiner and Steiner Tech include Essick humidifiers having falsely marked Steiner Tech patent numbers to the '378 Patent that have been imported by Essick since January 1, 2015 and assembled in Essick humidifiers Model Numbers Sears Kenmore 14416, Sears Kenmore (Canada) 29974, HD1409, EA 1407, Sears Kenmore 15420, Sears Kenmore (Canada) 29614, 7V4DTS 300, 7V4DTS 900, 7VEP9 500, EP9800, EP9R800, and Lowe's IHUM-10-140.

260.    Steiner and Steiner Tech have been damaged and continues to be damaged as a result of Essick's false association with Steiner and Steiner Tech through use of the '378 Patent markings and therefore Steiner and Steiner Tech are entitled a monetary recovery from Essick in an amount to adequately compensate Steiner and Steiner Tech for Essick's false association.

261.    Essick's false association has been and continues to be willful and deliberate, and without regard for Steiner's and Steiner Tech's rights, justifying the award of punitive damages.

262.    The Plaintiffs have no adequate remedy at law in that money damages are not adequate to compensate them for the wrongful acts of Essick. Unless the Court acts to permanently enjoin Essick, Essick's acts herein complained of have caused and will continue to cause great and irreparable damage to Plaintiffs. Insofar as damages will compensate Plaintiffs for such false and misleading representations of fact regarding Essick's products, Plaintiffs also seeks such monetary damages.

## COUNT IV – BREACH OF CONTRACT

263.    Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

264.    For all times relevant herein, the Steiner Tech-Essick Contract existed between Steiner Tech and Essick in which Essick requested services from Steiner Tech and Steiner Tech provided Steiner Services to Essick, and in return Essick agreed to deferred payment to Steiner Tech through Essick's payment to the Steiner Tech Suppliers of a per-unit purchased Steiner Services Premium from which the Steiner Tech Suppliers would then provide payment to Steiner Tech.

265.    Despite the Steiner Tech-Essick Contract and the continued ongoing business relationship between Essick and Steiner Tech that began in April 2007 during which Essick requested, received and relied on numerous Steiner Services from Steiner Tech which in turn Essick only paid Steiner Tech on the deferred Steiner Services Premium that was paid by Essick on a per-unit purchase from a Steiner Tech Supplier.

266.    Essick relied on the Steiner Tech-Essick Contract and Steiner Tech's agreement to extend a license to the Steiner Patents to Licensed Steiner Tech Suppliers in order that Essick was provided with licensed products.

267.    From 2007 through 2014, each Licensed Steiner Tech Suppliers paid Steiner Tech the Steiner Patent Premium as a patent royalty for each sale of a Steiner '086 Motor and Steiner '378 Controller to Essick.

268.    Steiner Tech performed all its obligations under the Steiner Tech-Essick Contract and provided Essick with Steiner Services as requested by Essick and Steiner Tech expended considerable costs and expenses during the performance of such Steiner Services.

269.    At no time from 2007 to the present has Essick made any direct payment to Steiner or Steiner Tech for any Steiner Service requested by Essick of Steiner Tech or as reimbursement of any cost or expense associated therewith. Pursuant to the Steiner Tech-Essick Contract, Steiner had separate contracts with each of the Steiner Tech Suppliers that would charge Essick the Steiner Services Premium to Essick and when paid would provide the deferred compensation to Steiner Tech.

270.    At all times, Essick knew that Steiner owned Steiner Patents and that Essick did not have a license to any of the Steiner Patents. However, Essick relied on the Steiner Tech-Essick Contract and the Steiner Tech's licensing of the Steiner Patents to the Steiner Tech Suppliers from which Essick purchased licensed components and products. Essick knew that the price paid by Essick to the Licensed Steiner Tech Suppliers included the Steiner Patent Premium and that the Licensed Steiner Tech Suppliers would provide the Steiner Patent Premium as a royalty payment to Steiner Tech.

271.    However, beginning as early as 2012, Essick materially breached the Steiner Tech-Essick Contract by:

a. making purchases directly from Steiner Tech Suppliers and not paying the Steiner Services Premium as the agreed to deferred payment for prior Steiner Services provided

to Essick by Steiner Tech, such that Steiner Tech did not receive Steiner Tech Premiums for Services it had rendered to Essick under the Steiner Tech-Essick Contract;

b. making purchases of infringing Steiner Controllers from Futec and Noke rather than from a Licensed Steiner Tech Supplier, where such payments to Futec and Noke for such controls did not include the Steiner Services Premium or the Steiner Patent Premium, and therefore which were not paid to Steiner Tech;

c. negotiating directly with the Steiner Tech Suppliers with the specific intent to eliminate Essick's payment to the Steiner Tech Suppliers of the Steiner Services Premium and the Steiner Patent Premium, to eliminate the Steiner Tech Suppliers payment of such, or any commission to Steiner Tech; and

d. purchasing Essick Components and Essick Products directly from Steiner Tech Suppliers, including, but not limited to, ProMotor, Noke, ABJ, Man-Li, Shenzhen Tech, and JinBida, with the result that each of these Steiner Tech Suppliers no longer made deferred payments for Steiner Services provided to Essick by Steiner Tech and no longer paid royalties to Steiner Tech for practicing the '378 Patent, all as required by the Steiner Tech-Essick Contract.

272.    Steiner Tech has been damaged as a result of each of Essick's breaches of contract and is therefore entitled to monetary relief from Essick in an amount sufficient for Steiner Tech to recover all its losses.

### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTS AND/OR TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES

273.    Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

274.    For all times relevant herein, Steiner Tech established and had in force exclusive written contracts with eight (8) Steiner Tech Suppliers for providing products and services to Essick under which Steiner Tech was to receive commissions and royalties. These Steiner Tech Supplier contracts include the Steiner Tech-Noke Contract, Steiner Tech-ProMotor Contract, Steiner Tech-ABJ Contract, Steiner Tech-Man-Li Contract, Steiner Tech-Wellsum Contract, Steiner Tech-Yang Feng Contract, Steiner Tech-Shenzhen Tech Contract, and Steiner Tech-JinBida Contract.

275.    For all relevant times, Steiner Tech was also the exclusive Licensor for the Noke '378 Patent License Agreement.

276.    For all relevant times, Steiner Tech was also the exclusive Licensor for the ProMotor '086 Patent License Agreement, the Yang Feng '086 Patent License Agreement, and the JinBida '086 Patent License Agreement.

277.    For all relevant times, Essick had full knowledge that Steiner Tech had agreements and contractual relationships with each of these Steiner Tech Suppliers and Essick relied on these agreements and their terms including the commissions to be paid to Steiner Tech by the Steiner Tech Suppliers as the only means to provide the deferred compensation to Steiner Tech under the Steiner Tech-Essick Contract for Steiner Services received by Essick from Steiner Tech and to enable Essick to purchase Essick Components and Essick Products that were licensed under the Steiner Patents.

278.    Beginning on or about July 2014, Essick unilaterally changed the procedures under the Steiner Tech-Essick Contract by changing how Essick dealt with the Steiner Tech Suppliers as an initial effort to bypass Steiner Tech and undermine Steiner Tech's business relationships and contracts with each of the Steiner Tech Suppliers. By doing so, Essick

intentionally eliminated Steiner from being able to directly identify purchases made by Essick from the Steiner Tech Suppliers, from which Steiner Tech's deferred compensation and patent royalties were previously based.

279.    In July 2014, Essick intentionally and maliciously began bypassing Steiner Tech and negotiating directly with the Steiner Tech Suppliers, including, ProMotor, Noke, ABJ, Man-Li, Shenzhen Tech, and JinBida, for the sole purpose of inducing each of these Steiner Tech Suppliers to breach their contracts with Steiner Tech and to directly contract with Essick directly.

280.    During these 2014 direct negotiations with each Steiner Tech Supplier, Essick sought to obtain the identification of the payments being made by the Steiner Tech Supplier to Steiner Tech for the sole purpose of seeking to eliminate Essick's payment of the Steiner Services Premium and Steiner Patent Premium, and thereby prevent the Steiner Tech Suppliers from being able to pay the commissions owed to Steiner Tech under the contracts each Steiner Tech Supplier has with Steiner Tech.

281.    Essick intentionally interfered with these Steiner Tech Suppliers by negotiating directly with them and to the exclusion of Steiner Tech for the sole purpose of seeking each Steiner Tech Supplier to breach its contract with Steiner Tech.

282.    Essick's acts in this regard were intentional and calculated by Essick as Essick did not attempt to redirect purchases of Essick Components and Essick Products that were covered by the then-enforceable Steiner '086 Patent (which expired in January 2015). Essick knew it did not have a license to the '086 Patent and as such Essick knew that it had to purchase motors that practiced the '086 Patent from Licensed Steiner Tech Suppliers until the '086 Patent expired in January 2015. The Chinese '086 Patent is not yet expired. As such, Essick acts have induced Futec and other Chinese suppliers to infringe the enforceable Chinese '086 Patent.

283.    Essick's intentional interference was further to eliminate having to pay the Steiner Patent Premiums as royalty payment for the Steiner Patents, which when not paid by the Steiner Tech suppliers to Steiner Tech, removed such as being licensed under the Chinese '086 Patent for the Steiner '086 motor manufactured in China as well the '378 Patent that covers the Steiner Controllers. As such, in this regard, Essick's intentional acts have resulted in Essick inducing the Chinese manufacturers into direct infringement of the Chinese '086 Patent, and in Essick's direct infringement of the '378 Patent by importing, offering for sale, and selling Essick Products in the United States. Further, Essick's acts in this regard has induced each of Essick's customers including, but not limited to Home Depot, Lowe's, Sears, Menards, and Ace Hardware, to infringe the '378 Patent through the offering for sale and selling of unlicensed Essick Products.

284.    Essick's direct negotiations and interference with the contracts with the Steiner Tech Suppliers resulted in each of the Steiner Tech Suppliers' ending their business arrangements with and breaching their contractual agreements with Steiner Tech with regard to Essick and purchases made by Essick from the Steiner Tech Suppliers.

285.    The Steiner Tech Suppliers' material breaches of their contractual agreements with Steiner Tech has resulted in the termination of Steiner Tech receiving any further amount of the deferred indirect payments from the majority if not all of the Steiner Tech Suppliers for purchases made by Essick from such Steiner Tech Suppliers.

286.    Essick's direct negotiations and interference with the '378 Patent licensing contract with the Licensed Steiner Tech Supplier, Noke, has resulted in the termination of Steiner Tech receiving any further payment of the Steiner Patent Premium which was the only royalty that Steiner Tech received for the '378 Patent.

287.    Essick's direction negotiations and interference with the '378 Patent licensing contract with the Licensed Steiner Tech Supplier, Noke, has resulted in Essick's importation, use, offers to sell and sale of unlicensed, infringing and unauthorized Steiner Controllers in numerous Essick products.

288.    Steiner Tech has been damaged as a result of Essick's intentional and malicious interference with the contract between Steiner Tech and the Steiner Tech Suppliers and is therefore entitled to monetary relief from Essick in an amount sufficient for Steiner Tech to recover all its losses.

289.    Steiner Tech is therefore entitled to a monetary recovery from Essick in an amount consistent with fundamental principles of justice, equity and good conscience.

290.    Essick has been and will continue to be unjustly enriched from its tortious interference with the contracts and business relationships between Steiner Tech and the Steiner Tech Suppliers, and such acts have been willful and deliberate, and without regard for Steiner's and Steiner Tech's rights, justifying the award of punitive damages.

## COUNT VI – UNJUST ENRICHMENT

291.    Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

292.    Since 2007, Essick has received and enjoyed substantial benefits Steiner Services provided by Steiner Tech to Essick.

293.    Since at least as early as January 2015, Essick has not fully compensated Steiner or Steiner Tech for the Steiner Services provided to Essick and Essick has taken steps intentionally designed to prevent Steiner and Steiner Tech from receiving any further amounts of

the deferred compensation that are required to fully compensate Steiner and Steiner Tech for the Steiner Services received by Essick.

294.    Essick has therefore been and will continue to be unjustly enriched to the detriment of Steiner  and Steiner Tech.

295.    Essick's retention of the substantial benefits garnered from receipt of the Steiner Services since 2007 without having fully paid Steiner and Steiner Tech violates the fundamental principles of justice, equity and good conscience.

296.    Essick's unjust enrichment has been substantial and is ongoing.

297.    Plaintiffs have no adequate remedy at law.

298.    Steiner and Steiner Tech are therefore entitled to a monetary recovery from Essick in an amount consistent with fundamental principles of justice, equity and good conscience.

299.    Essick's unjust enrichment has been made has been willful and deliberate, and without regard for Steiner's and Steiner Tech's rights, justifying an award of punitive damages.

## COUNT VII – QUANTUM MERUIT

300.    Plaintiffs reallege and incorporate by reference all of the allegations of paragraphs 1-220 above, inclusive, as if set forth fully herein.

301.    From 2007 through 2014, Essick requested Steiner and Steiner Tech provide Steiner Services to Essick in support of Essick's business and Essick Products.

302.    In response to Essick's requests, from 2007 through 2014, Steiner and Steiner Tech provided numerous and varied Steiner Services to Essick that included a wide array of valuable and substantial services important to and related to various Essick Products

303.    Essick has received and continues to receive substantial benefits from the Steiner Services it received from Steiner and Steiner Tech including substantial benefits related to the

65

development of numerous of Essick's current and best-selling Essick Products, such as for example, Essick humidifier models 7VEP9 500, EP9800, EP9R800, 7V4DTS 300, 7V4DTS 900, 7V696 400HB, 696800, 7VH12 300HB, 7VH12 400HB, and Lowe's IHUM-10-140.

304.    By requesting, acquiring, and/or utilizing Steiner Services from Steiner and Steiner Tech from 2007 through 2014, Essick entered into a contract-in-fact with Steiner and Steiner Tech for such requested, acquired and utilized Steiner Services.

305.    Neither Steiner nor Steiner Tech have been fully compensated by Essick for the vast majority of the Steiner Services that Steiner and Steiner Tech provided to Essick, and Essick has taken steps intentionally designed to prevent Steiner and Steiner Tech from receiving full compensation for those Steiner Services.

306.    It is unjust for Essick to retain the past and ongoing benefits of the received Steiner Services without Essick fully and adequately compensating Steiner Tech for such received Steiner Services and the benefits obtained therefrom.

307.    Plaintiffs have no adequate remedy at law.

308.    Steiner and Steiner Tech are therefore entitled to a monetary recovery from Essick for Essick's receipt and use of the benefits of Steiner Services in an amount consistent with fundamental principles of justice, equity and good conscience.

309.    Essick's misappropriation and use of Steiner Services without full payment has been willful and deliberate, and without regard to the rights of Steiner and for Steiner Tech, justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Steiner and Steiner Tech pray that this Court enter its Order:

A. Entering judgment against Essick and in favor of Steiner and Steiner Tech on all Counts in this Complaint;

B. Essick be adjudged and decreed to have willfully, directly, indirectly, and contributorily infringed the '378 Patent;

C. Essick be ordered to pay actual damages to Steiner and Steiner Tech in an appropriate amount to fully compensate Steiner and Steiner Tech, but not less than a reasonable royalty, for Essick's infringement of the '378 Patent in accordance with 35 U.S.C. §284, and that such damages be trebled in accordance with 35 U.S.C. §284;

D. Awarding Steiner and Steiner Tech interest and costs in accordance with 35 U.S.C. §284;

E. Declaring this case to be an "exceptional case" within the meaning of 35 U.S.C. §285 and that reasonable attorney's fees be awarded to Steiner and Steiner Tech;

F. That Essick be adjudged and decreed to have falsely marked Essick Components and Essick Products with the patent number of the '378 Patent since at least January 1, 2015;

G. That Essick be ordered to pay a fine in the amount of $500 per false marking as defined under U.S.C. §292 for false marking of Essick Products with the patent number of the '378 Patent with half of the proceeds being remitted to Steiner and Steiner Tech and the other half being remitted to the Court to the United States;

H. Entering a preliminary injunction against Essick, its officers, agents, servants and employees, and all entities and individuals acting in concert with them, to prevent further infringement of the '378 Patent and all false marking during the pendency of this case:

I. Entering a permanent injunction against Essick, its officers, agents, servants and employees, and all entities and individuals acting in concert with them, to prevent any further infringement of the '378 Patent and all further false marking;

J. That Essick be adjudged and decreed to have violated the Lanham Act by falsely representing and associating its Essick Products as being Steiner Tech Products or as other being associated with Steiner and/or Steiner Tech since at least January 1, 2015;

K. That Essick be ordered to pay Steiner and Steiner Tech damages in an amount to be determined resulting from Essick's violations of the Lanham Act sufficient to fully compensate Steiner and Steiner Tech for all of their resulting injuries, and that the Court treble these damages in accordance with 15 U.S.C. §1117;

L. That this Court find that the case is "exceptional" under the Lanham Act and award Steiner and Steiner Tech their reasonable attorney's fees in accordance with 35 U.S.C. §285, 15 U.S.C. §1117;

M. That Essick be adjudged to have materially breached the Steiner Tech-Essick Contract;

N. That Essick be ordered to pay Steiner Tech damages due to Essick's material breach of the Steiner Tech-Essick Contract in an amount equal to the amount of

68

unpaid deferred compensation for prior Steiner Services rendered by Steiner Tech to Essick;

O.   That Essick be adjudged to have intentionally and with malice interfered with the business relationships between Steiner Tech and each of the Steiner Tech Suppliers, and with each of the contracts that Steiner Tech has with each of the Steiner Tech Suppliers;

P.   Essick be ordered to pay Steiner Tech damages for its tortious interference in an amount that will fully compensate Steiner and Steiner Tech for all unpaid prior services rendered and for the expected future compensation that Steiner and Steiner Tech would have received under those contracts but for Essick's interferences;

Q.   Awarding Steiner and Steiner Tech punitive damages sufficient to adequately discourage Essick from perpetrating such willful acts in the future;

R.   Awarding Steiner and Steiner Tech their costs and attorney's fees and expenses to the full extent provided by all applicable federal and state laws;

S.   Awarding Steiner and Steiner Tech pre-judgment interest, and where applicable post-judgment interest, on any and all monetary awards that are part of the judgment against Essick; and

T.   Awarding Steiner and Steiner Tech all such other and further relief the Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

In accordance with the Federal Rules of Civil Procedure Rules 5 and 38, Plaintiffs hereby demand a jury trial.

Respectfully Submitted,


By: /David L. Howard/
David L. Howard, EDMO #41671MO
Polster, Lieder, Woodruff & Lucchesi, L.C.
12412 Powerscourt Drive, Suite 200
St. Louis, Missouri 63131-3615
(314) 238-2400
(314) 238-2401 (Telefax)
E-mail: dhoward@PolsterLieder.com

ATTORNEYS FOR PLAINTIFFS


Attachments:

Exhibits 1-60 with Exhibits 4, 11, 12, 42-44, 46-52 filed Under Seal.